NATHAN WADE, a Minor, by Gary Wade, his Father and Next Friend, Plaintiff-Appellant, v. ROBERT RICH *et al.*, Defendants and Third-Party Plaintiffs-Appellees (Tammy Wade, Third-Party Defendant).

Fifth District No. 5—91—0882

Opinion filed August 17, 1993.

LEWIS, J., dissenting.

Brent D. Holmes, of Heller, Holmes, Hefner & Eberspacher, Ltd., of Mattoon, for appellant.

John P. Ewart and P. Bartley Durham, both of Craig & Craig, of Mattoon, for appellees.

JUSTICE WELCH delivered the opinion of the court:

Plaintiff, Nathan Wade (Nathan or plaintiff), by his father and next friend, Gary Wade, appeals from the court's order denying him a new trial as to damages only following a jury verdict in his favor, contending that the jury's damages award was erroneous as it reflects that the jury disregarded an element of damages proven at trial. In his appeal, the plaintiff raises four issues: (1) that the court erred in denying his post-trial motion for a new trial as to damages only; (2) that the court erred in denying his motion for summary judgment at the beginning of trial and in denying his motion for directed verdict at the close of all the evidence; (3) that the court erred in denying plaintiff's motion for leave to amend his complaint to add two additional counts; and (4) that the court erred in refusing his tendered jury instruction on damages arising in the future.

We first must set forth a brief statement of facts for a better understanding of this case, even though the jury found for the plaintiff and the defendant did not cross-appeal on the question of liability. Essentially, the evidence revealed that on April 28, 1987, Tammy Wade (Tammy) took her son Nathan, her daughter Danielle, and a six-month-old baby she was babysitting to visit her mother, Nancy Probst, at the defendant's, Janet Rich's, beauty salon. While leaving the beauty salon to go on to Tammy's parents' home, Nathan was bitten by the defendants' dog, Odie, on his head and face. Nathan was taken to the emergency room of St. Anthony's Memorial Hospital, where he received a total of 23 stitches on various lacerations resulting from the dog bite. At the time of the incident, Nathan was 18 months old and the dog Odie was a year and a half old.

Plaintiff's complaint was brought under section 16 of the Animal Control Act. (Ill. Rev. Stat. 1989, ch. 8, par. 366.) Defendants filed an answer and a third-party complaint against Tammy Wade for contributory negligence. Following the filing of defendants' answer, plaintiff moved for summary judgment, which was denied by the court. Plaintiff also sought to amend his complaint to add a count of common law negligence. The court allowed his motion for leave to amend, but the amended complaint was dismissed pursuant to the defendants' motion for failure to state a cause of action. Plaintiff again attempted to amend his complaint about a week before trial was to commence, and in his amended complaint, he reasserted his common law negligence action and also raised a count under the Premises Liability Act. (Ill. Rev. Stat. 1989, ch. 80, par. 301 *et seq.*) The common law negligence count asserted in the second amended complaint was identical to the count of common law negligence raised in the first amended complaint. The court denied the plaintiff's motion to amend his complaint.

■ Under the Animal Control Act, a plaintiff must show the following in order to prove liability: (1) that the defendants' dog attacked the plaintiff without provocation; (2) that the defendants were the owners of the dog; (3) that the plaintiff's conduct was peaceable; and (4) that the plaintiff was injured while in a place where he had a legal right to be. (*Barr v. Groll* (1991), 208 Ill. App. 3d 318, 567 N.E.2d 13.) At trial, the primary issue litigated before the jury was the issue of provocation. Defendants admitted in their answer and at trial that they owned the dog which bit Nathan, that Nathan's conduct was peaceable, and that Nathan was in a place where he had a legal right to be.

The evidence regarding provocation was conflicting and consisted of the following: Tammy testified that when she was preparing to leave the defendants' beauty shop, she was carrying the baby on her right hip, and that Nathan was standing at the latched storm door, with his right hand on the door frame and his left hand on the storm door. Odie was lying in the sun on a concrete pad outside of the storm door. Odie was positioned so that his head was away from the door, but the door would swing over his legs as the door opened. Tammy unlatched the door with her left hand and propped the door open with her left foot, as the door had an automatic closer on it. She took Nathan's hand and helped him down the 4- to 6-inch step to the concrete pad, then she turned to say something to her mother just before going out the door. Tammy stated she saw a "blur" out of the corner of her eye, and the next

thing she knew, Nathan was lying on his back on the concrete pad with Odie on top of him and Odie was biting Nathan. Tammy handed the baby she was holding to defendant Janet Rich, grabbed the dog, and threw it off of her son, who was bleeding about the head and face. Tammy's mother then drove Tammy, Nathan, and Danielle to the emergency room at the hospital where the doctor treated his injuries. Defendant Janet Rich kept the baby.

Defendant Janet Rich's version of the incident was that, just before Tammy opened the storm door, Nathan had been leaning against the door and had both of his hands on the glass. Janet stated that Tammy had the baby on her left hip, and when she opened the door, Nathan lost his balance and fell out of the door. When Nathan fell, he fell into the "middle" of Odie, who was asleep in the sun. Janet saw Odie's head and back legs curl up around Nathan, and Nathan "flopped" over. Janet did not actually see Odie bite Nathan, but she saw Odie's head over Nathan's. According to Janet, Odie then stood "back and looked at Nathan like he was startled."

Nancy Probst, Tammy's mother and Nathan's grandmother, testified that she did not see Odie at the foot of the door. Nancy noticed that, before Tammy opened the storm door, Nathan had one hand on the door and the other hand on the door frame. Tammy opened the door slowly and had control over the door. Nathan pushed on the door for balance. Nancy turned away at that time to fill out some raffle tickets that Janet was selling for her son and, therefore, did not see the incident. The next thing that Nancy knew, Tammy and Nathan were screaming. Nancy was "fairly certain" that Janet went out and got Odie off of Nathan.

In addition to the evidence on provocation, the plaintiff also presented evidence on damages. Tammy testified that after Odie bit Nathan, Nathan was screaming and he continued to scream until he reached the hospital. She was unable to calm him down due to the pain. At the hospital, Tammy was not allowed to stay with Nathan while he was being sutured, and an hour later, when Nathan was brought out to her, Nathan was sedated. According to Tammy, Nathan's face was swollen in addition to being sutured. That evening, Nathan wanted to be held by his mother, which she did. Tammy had received orders from the doctor to wake Nathan that night every two hours to check for concussion, which she also did.

The next day, Nathan's sedative had worn off, and he was in pain and "cranky." Tammy spent the day holding him and rocking him. Although Nathan generally liked to eat, he had very little ap-

petite that day. Tammy observed that Nathan acted like he had a headache, and Nathan would "poke" at his stitches like he was trying to determine where the pain was coming from. Tammy stated that Nathan would lay his head on her shoulder and cry. That evening, Nathan ate a little, but he subsequently vomited three to four times. Because she was concerned about concussion, Tammy took Nathan to the emergency room. Nathan was again examined at the hospital and released, and Tammy was advised as to the other symptoms to watch for.

Tammy testified that the second day after the incident, Nathan was about the same; however, he did not stay on her lap as much. Nathan also moved around better. Tammy took Nathan for followup care to Dr. Foster a couple of days later. A colleague of Dr. Foster's, Dr. Bristow, removed Nathan's stitches a few days after the visit to Dr. Foster. Tammy stated that the removal of the stitches was painful for Nathan and that he cried and screamed when this was done.

Tammy took Nathan to see Dr. Chiu, an eye specialist, at the request of Drs. Foster and Bristow. The doctors suggested this because of the bruising around Nathan's eyes. Dr. Chiu froze Nathan's pupils and looked for signs of visual damage, but he found none. Dr. Chiu did a followup examination 9 to 12 months later. It did not appear that Nathan had any problem with his eyes.

Tammy explained that even after Nathan physically healed, he did not sleep well. Before the incident with Odie, Nathan slept through the night, but after Odie's attack, Nathan would wake up in the middle of the night sweating and whimpering; however, these episodes have become less frequent as time passes. Nathan also did not want to be very far away from Tammy for some time after the incident.

Tammy stated that the scars on Nathan's face are noticeable but have faded well with time. Nathan has a scar across his nose and an indentation in his cheek. The largest scar from the incident runs from the top of Nathan's forehead into the hairline and is concealed by his hair, as long as his hair is kept long.

Tammy, her husband, Gary, and her father testified that Nathan has been afraid of dogs since the incident, but they have gradually introduced him to other dogs and have decreased this fear. Now, just large dogs scare him.

A videotaped evidence deposition of Dr. Mamerto Guinto was presented to the jury. Dr. Guinto testified that he was the emergency room physician who treated Nathan on April 28, 1987. When

the doctor examined Nathan, he was "quite irritable, crying, with multiple lacerations." Altogether, Nathan had seven cuts. The largest of the lacerations was four to five inches long and was at the top left of Nathan's forehead, and this cut required 13 stitches. Another laceration required three stitches, two of the lacerations required two stitches, and the remaining three cuts required one stitch each.

According to the doctor, Nathan's injuries caused him pain and suffering. After suturing Nathan's cuts, Dr. Guinto prescribed an antibiotic ointment and an antibiotic medicine, which is always done for wounds due to bites. Dr. Guinto also gave Tammy precautionary instructions for a possible head injury. Dr. Guinto testified that Nathan's wounds would produce scars and that the scars would be permanent; however, Dr. Guinto had not seen Nathan since that day in the emergency room and did not know whether Nathan's scars were visible. In addition to Dr. Guinto's testimony, Nathan, who was five years old at the time of trial, was paraded before each row of jurors so that they might observe firsthand the presence, or lack, of scarring from his injuries.

The medical bills incurred as a result of Nathan's treatment were introduced into evidence. These bills are not in the record presented on appeal, but in defendants' closing argument, counsel enumerated the medical expenses as $65 for Dr. Chiu, $28 for the Marshall Clinic (Drs. Foster and Bristow), and $226.64 for St. Anthony's Memorial Hospital, for a total of $319.64. In closing argument, plaintiff's attorney argued that, if the jury found defendants liable, the jury was required to consider Nathan's pain and suffering, the emotional trauma of Nathan, his disfigurement, and his actual medical expenses in determining his damages. Plaintiff's counsel suggested a figure of $25,000 as being an adequate award for Nathan's damages. In defendants' closing argument, defense counsel asserted that it was defendants' position that they were not liable, but, if the jury disagreed and found the defendants liable, he suggested that $3,000 to $6,000 was an adequate damages award.

Following trial, the jury found that the defendants were liable and awarded the plaintiff damages in the amount of $319.64, a figure which exactly matched Nathan's medical expenses. The jury also found in favor of third-party defendant Tammy Wade on defendants' third-party complaint against her for contributory negligence. The court entered judgment on the jury's verdicts. Subsequently, plaintiff filed a post-trial motion in which he asserted that the jury's verdict was against the manifest weight of the evidence,

since it appeared that the jury failed to consider plaintiff's unrebutted evidence of specific elements of damages, *i.e.*, pain and suffering, as well as disfigurement. Plaintiff asked that the court order a new trial on damages only as his relief. Plaintiff also asserted in his post-trial motion that the court erred in refusing his tendered jury instruction on damages arising in the future. The court denied the plaintiff's post-trial motion, and this appeal ensued.

The first issue for consideration is whether the court erred in refusing plaintiff a new trial on damages only. The plaintiff argues that the jury's award of damages was against the manifest weight of the evidence since it obviously only awarded medical expenses, thereby disregarding the plaintiff's unrebutted proof of pain and suffering and of disfigurement, both elements of damages. The plaintiff asserts that the court, in its order, found that the jury's failure to award damages for pain and suffering was against the manifest weight of the evidence but still denied his motion for a new trial as to damages only, clearly an abuse of the court's discretion. We agree.

■ Generally, a decision as to whether to grant a new trial is a matter left to the sound discretion of the court, and the court's determination will not be overturned on review absent an abuse of discretion. (*Hinnen v. Burnett* (1986), 144 Ill. App. 3d 1038, 495 N.E.2d 141.) However, a jury's verdict may be set aside and a new trial ordered where the amount of damages is palpably inadequate or against the manifest weight of the evidence or where the jury has clearly disregarded a proven element of damages. (*Hinnen v. Burnett* (1986), 144 Ill. App. 3d 1038, 495 N.E.2d 141.) The standard for granting a new trial on damages alone is that it is appropriate to grant such a request where (1) a jury's verdict on liability is amply supported by the evidence, (2) the questions of liability and damages are so separate and distinct that if a trial is limited to the question of damages only, the defendant will not be treated unfairly, and (3) the record does not suggest that the jury reached a compromise verdict or that, in some other identifiable manner, the error which resulted in the jury's awarding inadequate damages also affected its verdict on the question of liability. *Burnham v. Lewis* (1991), 217 Ill. App. 3d 752, 577 N.E.2d 922.

In the case *sub judice*, the trial judge took the time to write an excellent order clearly setting forth his reasoning, so it bears repeating:

> "The Plaintiff filed a motion for a new trial on the issue of damages only, alleging the verdict was for medical expenses

only and ignored uncontradicted evidence of pain and suffering and disfigurement. The Third Party Plaintiffs filed a motion for new trial alleging the Third Party verdict was against the manifest weight of the evidence but indicated that the Court could deny that motion in event the Court denied the Plaintiff's post trial motion [*sic*].

The Defendants claim: 1.) there is no inconsistency in the verdict; and 2.) in the alternative, if the Court finds the verdict to be inconsistent with the evidence, that the issue of liability was vigorously contested, the verdict was the result of a compromise and it would be unfair to the Defendants to relitigate the issue of damage only. Each side agrees that the Court does not have before it a motion for new trial on all issues.

The Court, having considered the evidence at the trial, the law applicable, and the arguments of counsel finds:

1. The verdict is against the manifest weight of the evidence. While the verdict form requested by the Plaintiff was not itemized, it was clear from the evidence and arguments that recovery was sought for a.) medical bills; b.) pain and suffering and; c.) disfigurements. The verdict reflected the exact amount of the medical bills and therefore presumably nothing for pain and suffering or disfigurements. The issue of disfigurement was disputed. At the request of both parties, the Plaintiff walked slowly in front of each row of jurors so they could personally observe the scarring or lack thereof. The Court cannot, as a matter of law[,] state that the jury improperly ignored disfigurement. The jury certainly could have decided, based on the successful recovery, that the scarring, if any, that existed was so minimal so as to not require compensation. On the other hand, the testimony regarding pain and suffering was unrebutted. The jury was not present at the time of the incident to observe first hand the pain and suffering[ ] (as they could the disfigurement or lack thereof). The photographs admitted into evidence display lacerations requiring numerous sutures. The Court rules that not compensating the Plaintiff for pain and suffering was against the manifest weight of the evidence.

2. *** [L]iability was a close issue. Provocation as a defense was raised and argued. In fact, the bulk of the case in chief revolved around the issue of provocation. The

Court cannot state that the evidence of liability was so clear that there is no issue on this point for a second jury to try. It appears that the jury ignored a proven element of damages as to arrive at a compromised verdict between liability and damages. It would be fundamentally unfair under these circumstances to order a new trial on damages only.

There being no motion pending for a new trial on all issues, the motion for a new trial on damages only is denied."

Thus, while the court did, as plaintiff asserts, find that the jury's award for damages as to pain and suffering was against the manifest weight of the evidence, so, too, did the court find that the jury's determination was a compromised verdict between the liability and the damages.

We agree with the trial court that the jury's award of damages is against the manifest weight of the evidence in that the jury ignored or disregarded unrebutted evidence of the plaintiff's pain and suffering. However, we do not agree with the trial court that the jury's verdict represents a compromise on the issue of liability.

■ We find that the issue of liability is clear and that the jury's finding of liability is amply supported by the evidence and is justified. The only disputed fact as to liability was the presence or absence of provocation on the part of plaintiff. At trial, defendant testified that plaintiff fell out the door and onto the dog. Plaintiff's mother and grandmother, who were present during the attack, testified that they did not actually see the events immediately prior to the attack. Both had turned their heads the instant before the attack and looked back after the attack had begun. The evidence indicates, therefore, that the plaintiff accidentally fell onto the dog, which responded by biting the plaintiff on and about the head.

It is clear that an unintentional or accidental act can constitute provocation within the meaning of section 16 of the Animal Control Act. (*Nelson v. Lewis* (1976), 36 Ill. App. 3d 130, 344 N.E.2d 268.) However, it is also clear that where the acts which stimulated or excited the dog were unintentional, as they were in the case before us, no provocation can be said to exist within the meaning of the statute if the acts cause the dog to attack the plaintiff viciously and the vicious attack is out of all proportion to the unintentional acts involved. (*Robinson v. Meadows* (1990), 203 Ill. App. 3d 706, 713, 561 N.E.2d 111, 115.) Thus, in *Nelson*, the 2½-year-old plaintiff accidentally stepped or fell on the tail of a dog which was chewing a bone. The dog reacted by scratching the plaintiff's eye. This court

held that that case did not involve a vicious attack which was out of proportion to the unintentional acts involved and that provocation existed. In *Robinson*, the four-year-old plaintiff began screaming when defendant's dog began barking. The dog responded by attacking plaintiff viciously, tearing her lip and inflicting puncture wounds and scratches on her face, neck, and throat. In that case, this court held that, while plaintiff's scream triggered the attack on her by the dog, that scream could not be regarded as having been sufficient to account for the savagery of the dog's assault. Thus, as a matter of law, no provocation could be said to have existed.

In the instant case, the 18-month-old plaintiff accidentally fell onto the middle of the dog, which was sleeping in the sun. The dog responded by repeatedly biting plaintiff on and about the head and face, resulting in seven lacerations, the largest one being four to five inches long. Plaintiff required a total of 23 stitches. The viciousness of the dog's attack on plaintiff, which was out of proportion to the unintentional act committed by plaintiff, clearly establishes the defendants' liability for plaintiff's damages. Thus, the jury's finding of liability is amply supported by the evidence.

Furthermore, the questions of liability and damages are so separate and distinct in the instant case that a trial limited to the question of damages only would not be unfair to defendant. The issues of liability and damages are not intertwined in the instant case, and no prejudice would result to defendant as a result of a new trial on the issue of damages only.

Finally, we find nothing in the record suggesting that the jury reached a compromise verdict. To test whether a verdict resulted from a compromise on the question of liability, it must be determined if the verdict on the issue of liability was supported by the evidence. (*Sommer v. City of Taylorville* (1978), 59 Ill. App. 3d 765, 767, 375 N.E.2d 1031, 1032.) The trial court bases its finding of a compromise verdict on its view that the issue of liability was a close one. As we have already stated, we do not share the trial court's view on this point. Instead, we think that liability was clearly established and that the verdict on the issue of liability is amply supported by the evidence. Accordingly, we do not agree with the trial court's finding of a compromised verdict. Instead, we find that the jury erroneously ignored the proof of plaintiff's pain and suffering and its verdict with respect to damages is against the manifest weight of the evidence. We therefore reverse the judgment of the trial court denying plaintiff's post-trial motion for a new trial on

the issue of damages only and remand this cause to the trial court for a new trial on the issue of damages.

 The plaintiff's second and third issues raised on appeal present similar resolutions, and thus, we will consider them together. The second issue raised by the plaintiff is that the court erred in denying his motion for summary judgment before trial and in denying his motion for directed verdict at the close of all the evidence. The third issue raised by the plaintiff is that the court erred in denying his motion for leave to amend his complaint to add a count of common law negligence and a count under the Premises Liability Act. Both of these issues have been waived by the plaintiff for failure to raise them in his post-trial motion. (*Thacker v. U N R Industries, Inc.* (1991), 213 Ill. App. 3d 38, 572 N.E.2d 341, *aff'd* (1992), 151 Ill. 2d 343, 603 N.E.2d 449.) As the appellate court in *Thacker* pointed out, Supreme Court Rule 366(b)(2)(iii) (134 Ill. 2d R. 366(b)(2)(iii)) requires that a claim of error be preserved by inclusion in a post-trial motion and that few, if any, exceptions to the rule are permitted. (*Thacker v. U N R Industries, Inc.* (1991), 213 Ill. App. 3d 38, 572 N.E.2d 341.) (The supreme court in *Thacker* did find an exception to the rule, although it was not because defendant failed to include a claim of error in his post-trial motion as to the denial of judgment *n.o.v.*; rather, the court felt that justice required it to consider defendant's argument even though defendant did not technically meet the requirement of a little-known rule that defendant had to object specifically to a special finding of fact by the jury in order to preserve his objection to the denial of the judgment *n.o.v.* (*Thacker v. U N R Industries, Inc.* (1992), 151 Ill. 2d 343, 603 N.E.2d 449).)

Plaintiff cites cases that hold that a party does not have to file a post-trial motion in order to preserve the *granting* of a directed verdict. (See *Larson v. Harris* (1966), 77 Ill. App. 2d 430, 222 N.E.2d 566, *aff'd* (1967), 38 Ill. 2d 436, 231 N.E.2d 421; *Hladish v. Whitman* (1989), 192 Ill. App. 3d 561, 549 N.E.2d 5.) The reason that an objection to the granting of a directed verdict does not have to be raised in a post-trial motion under Supreme Court Rule 366 (b)(2)(iii) is that the rule does not apply in nonjury trials and thus when the verdict is directed by the court the jury trial in effect becomes a nonjury trial.

We see no reason to encourage plaintiffs and defendants not to include denials of their motions of a directed verdict or summary judgment in their post-trial motions, and in fact, there are good reasons to require strict adherence to the rule that all objections

must be raised in a post-trial motion or else those objections are waived. Since plaintiff did not include these two issues in his post-trial motion, we decline to consider them.

The plaintiff's issue on denial of his motion for summary judgment and denial of his motion for directed verdict need not be considered for an additional reason. It is well established that a denial of a motion for summary judgment is not subject to review on appeal after a trial has been held, as any error in the denial merges into the subsequent judgment. (*Rice v. Merchants National Bank* (1991), 213 Ill. App. 3d 790, 572 N.E.2d 439.) Further, even if we could reverse the court's ruling, which we cannot, it would have no technical effect, as the plaintiff would be in the same position as he is following the jury verdict, with a favorable verdict on liability. This same reasoning applies equally to the plaintiff's issue on denial of his motion for a directed verdict as to liability. A reversal would have no technical effect, and we would be ruling for the sake of ruling only.

Just as there were additional reasons not to consider the plaintiff's second issue, there is likewise an additional reason not to consider his issue that the court erred in denying his motion for leave to amend his complaint. At this point in time, the plaintiff's issue on his motion to amend his complaint is moot. Questions which arise from a trial court's order "are moot when, because of developments following issuance of that order, reversal of the order can have no practical effect on the controversy." (*In re Marriage of Holem* (1987), 153 Ill. App. 3d 1095, 1098, 506 N.E.2d 739, 741.) Because of the plaintiff's successful outcome on the liability issue under his cause of action under the Animal Control Act, a reversal on the court's ruling on his motion for leave to amend would have no practical effect on the controversy and is, therefore, moot.

The plaintiff's last issue presented for review is that the court erred in refusing his tendered instruction on permanency of the plaintiff's injuries. The instruction tendered by the plaintiff stated as follows:

> "If you find that the plaintiff is entitled to damages arising in the future because of injuries, you must determine the amount of these damages which will arise in the future. If these damages are permanent in nature, then in computing these damages you may consider how long the plaintiff is likely to live."

This instruction is identical to Illinois Pattern Jury Instruction No. 34.01. (Illinois Pattern Jury Instructions, Civil, No. 34.01 (3d ed.

1992).) Plaintiff tendered this instruction because Dr. Guinto testified that plaintiff's scars from his injuries would be permanent. However, because we have ordered a new trial on the issue of damages, and because the proof presented at this new trial may differ from that presented at the previous trial, we decline to comment on this final issue raised by plaintiff on appeal.

For the foregoing reasons, the judgment of the circuit court of Effingham County denying plaintiff's post-trial motion for a new trial on the issue of damages only is reversed, and this cause is remanded to the trial court for a new trial on the issue of damages.

Reversed and remanded.

RARICK, J., concurs.

JUSTICE LEWIS, dissenting:
Chaucer wrote in *Troilus and Chriseyde*:
"It is nought good a sleeping hound to wake." Shakespeare gave the same admonition in *Henry IV* and *Henry VIII*. Scott, Dickens, and many others made similar warnings, so that now Webster simply sets out that "let sleeping dogs lie" is a colloquial expression and does not give any source. Webster's New World Dictionary 403 (3d College ed. 1988).

I do not wish to appear to be unsympathetic to the plaintiff and his mother, as I have personally witnessed dogs biting small children and the terror that such an event causes the parent and the child. If it were my child, I would be ready to shoot the dog. The point I am making is, however, that for centuries we have known that dogs bite when they are suddenly awakened from sleep. We also know that whenever you commingle small children and dogs, one or the other is going to be hurt. The legislators and jurors do not live in a vacuum; they are aware of the nature of dogs and children.

The admonition of Chaucer should be heeded by this court, as we are entering an area that should best be left to the legislature and juries. The legislature is well aware of how many people own dogs and how emotionally attached they become to their dogs. (As State's Attorney, I filed charges against a woman who had moved to my county from Chicago and who had misappropriated a neighbor's good rabbit dog as a pet for her children. The colorful trial judge, after patiently advising defendant that the constitution does not provide "dognappers and barn burners" with the right to select

the tree from whence they shall be hanged, told defendant: "Ma'am let me give you a little advice. Down here in Southern Illinois you don't mess with people's dogs or people's children. *And in that order!*" I have paused to reflect as to whether my reasoning in this case is in accordance with the law or whether it is in accordance with my heritage.) If the legislature desires to impose absolute liability on dog owners, then it should do so. The courts have no business carving out exceptions in the Animal Control Act to meet the judges' personal opinions.

Isn't it strange that in this appellate district we have had juries in St. Clair, Saline, Washington, and now Effingham Counties (see *Nelson v. Lewis* (1976), 36 Ill. App. 3d 130, 344 N.E.2d 268; *Robinson v. Meadows* (1990), 203 Ill. App. 3d 706, 561 N.E.2d 111; *Smith v. Pitchford* (1991), 219 Ill. App. 3d 152, 579 N.E.2d 24) that all ruled in favor of the dog owner as to the issue of provocation but were then reversed by this court? Possibly, we judges, because of our education and elevated position, know something about how dogs think that the 48 jurors chosen at random do not?

This court has entered the canine-psychology field. We apparently are going to decide how a reasonable dog should respond to unintentional provocation by a child as a matter of law. Normally, we let juries decide facts and what responses a reasonable person would make to certain stimuli. The majority opinion decides the factual situation, *i.e.*, that a sleeping dog should not repeatedly bite a child if it is suddenly awakened by the child falling or stepping on it. I realize that jurors may not be qualified to decide what is a proper reaction by a dog in a given situation, but as much as I hate to admit it, most people would trust the collective wisdom of the jury more than they would trust the collective wisdom of this court! Juries decide many issues in very complex fields in which they are not knowledgeable, and we as judges are happy that they do so. Surely the dog bite cases are another area in which juries should be used in deciding whether the dog was provoked and whether the dog's response to the provocation was to be expected. If we as judges are going to shoulder the burden of deciding as a matter of law what the proper response of a dog should be to a certain provocation, then we will be deciding whether as a matter of law one bite is all right but three bites are too many, or 10 stitches are okay but 23 stitches are not. What happens if there is only one bite but the child loses an eye or a finger? Is the defendant not liable for the damages caused by the dog's first bite as a matter of law but liable for all subsequent bites? When this case is retried on damages

only, will the defendant be allowed to show that the largest laceration of four to five inches was caused by the dog's first bite, which may be a legitimate response to the provocation? How can the courts make a factual determination as a matter of law as to what response or responses of a dog are "out of proportion to the unintentional act committed by plaintiff?"

There may be some cases, such as in *Robinson* and *Smith*, in which a court can legitimately say that the stimuli do not amount to provocation. In battery cases, the courts hold that even though the victim makes unpropitious comments about the defendant's mother, those comments, as provoking as they may be, do not justify a punch in the nose. So, screaming by a child or saying a dog's name while petting the dog is not going to be recognized as a matter of law as provocation of a dog. The majority seems to recognize that falling on a dog while it is asleep is provocation, as unintentional as it may be. Why the majority would then wish to shoulder the burden of determining an appropriate response by the dog is beyond me. If a child fell or jumped on a sleeping human, would we be surprised if the human lashed out with his or her fists and injured the child severely? Why should a dog be held to a higher standard than a supposedly more intelligent animal? If the legislature wishes to hold the dog to such a high standard, then all the legislature has to do is pass a law. Meanwhile, let's let the jury perform its function of determining what would be an appropriate response (*i.e.*, when is the dog ceasing to respond to the provocation and merely being vicious) and the liability of the defendant.

I also disagree with the majority's view that the verdict was not a compromise verdict. The defense attorney clearly told the jury that $3,000 to $6,000 would be an adequate award. Both attorneys talked about pain and suffering, emotional trauma, and disfigurement in their arguments to the jury. There is no way that the jury "ignored the proof of plaintiff's pain and suffering."

We appellate justices are constantly complaining about trial judges not telling us what happened at the trial or why they ruled in such a manner. In this case, the trial judge did an excellent job in setting out what had occurred and why he felt boxed in by plaintiff's request for a new trial on damages only. How can we sit in Mt. Vernon a year later and decide that we know better than Judge Brummer what was going on in Effingham County? Trial judges have ways and means of knowing many things that are not on the record, and even if something occurs on the record, the event may be different from what it appears to be in the transcript. These are

just two reasons why the appellate courts defer to the trial judge's judgment in many instances.

Judge Brummer indicated that he wished that he could grant a new trial on all the issues, but he was boxed in by plaintiff's request for a new trial on damages only. The plaintiff's attorney wisely recognizes that a second trial most often is not as good as the first trial from a plaintiff's viewpoint. He now knows that juries are not very sympathetic to victims in dog bite cases. Our system is not perfect, but the legislature and the jury have spoken. I would like to award a lot of money to the victim in this case as compensation for his injury, but to do so would mean substituting my judgment for the legislature's and the jury's judgments. I am not prepared to become the supreme lawmaker.

To award damages for an injury there normally should be a wrong or some fault on the part of defendant, not just deep pockets. The owners were not accused of negligence for allowing the dog to sleep outside the entrance door, of strict liability to a business invitee, or of strict liability for owning a vicious dog. They did nothing wrong under the issue in this case other than mere ownership of a dog. For some reason, we feel that the owner should be held responsible for the acts of his dog because we think of the dog as being more human and as an extension or representative of the owner as opposed to inanimate property. There are many instances, however, where an owner of property is not held responsible, and we are not upset by such a result merely because the property was in some way involved in the injury (*e.g.*, the child could have fallen down some stairs or off a tree branch without liability being imposed on the owner of the property). If damages are to be awarded under the Animal Control Act because of mere ownership, then the legislature, and not this court, should say so.

In considering the effect of the majority opinion, I am reminded of the old Southern Illinois expression about things that will not work, "This dog don't hunt."

Accordingly, I would affirm the trial court.