KATHLEEN THOMPSON, Indiv. and as Adm'r of the Estate of Richard Thompson, Deceased, *et al.*, Plaintiffs-Appellees, v. THE COUNTY OF COOK *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 1—90—1547

Opinion filed November 19, 1991.—Rehearing denied December 17, 1991.

Jack O'Malley, State's Attorney, of Chicago (Joan S. Cherry and Frank J. Oles, Assistant State's Attorneys, of counsel), for appellants.

Leahy & Donovan, of Chicago, and Roy D. Simon, Jr., of Washington University School of Law, of St. Louis, Missouri (Tom Leahy, of counsel), for appellees.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

An intoxicated driver, while exceeding the speed limit, went off a highway alleged to have been lacking in proper warning signs, causing the death of his intoxicated passenger. The issue is whether the deceased's widow, minor child and personal representative may recover damages for his death under the provisions of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1981, ch. 85, par. 1—101 *et seq.*).

On March 6, 1982, at about 7:00 p.m., Richard Thompson and Brian Gittings visited Richard's brother, Mark Thompson, Mark's wife, and their newborn baby at Humana Hospital. While there, according to Mark's testimony, Gittings told Mark that he and Richard had been drinking beer that afternoon at the Arlington Park Boat Show and that subsequently they had gone to the Assembly, a tavern, where they drank beer and "shots." Based upon what Mark had heard and observed of Gittings at the hospital and his four years of experience as a bartender, he concluded that Gittings had been drinking and that Richard had been drinking even more heavily.

Police officer Gary Dembek testified as follows: At approximately 8:50 p.m., as Gittings was driving west on Route 62, Dembek picked his car up on radar. Although Dembek would typically give drivers "an allowance of 12 to 13 miles an hour before [he] would stop them," his radar indicated that Gittings was driving at 69 miles per hour in a 55-mile-per-hour zone. Dembek activated the Mars lights on his roof, turned his vehicle around and pursued Gittings in an attempt to stop him. After Dembek followed him for a short while on Route 62, Gittings turned northbound onto Sutton Road, where Dembek continued to pursue him. Although the posted speed limit on Sutton Road was

35 miles per hour, Dembek estimated the speed of Gittings' vehicle to be in excess of 80 to 85 miles per hour. He did not at any time observe Gittings weaving along the road. Dembek lost sight of Gittings' vehicle as it continued northbound on Sutton Road. As Dembek entered a curve he observed several small tree branches lying in the roadway, but continued northbound on the road past the curve and the branches. He estimated his speed through the hills and curves to be approximately 60 to 65 miles per hour, and 85 to 90 miles per hour on the straightaways. Dembek continued his search for Gittings' vehicle on Sutton Road until he reached Lake-Cook Road.

When he was unable to locate Gittings' vehicle, he turned his squad car around and returned to where he had seen the branches on the road. He then left the car to get a better look at the scene and discovered an Oldsmobile, which appeared to be the vehicle he had been pursuing only moments before, at the bottom of a ravine, heavily damaged and covered with tree branches. Dembek observed that the only occupant of Gittings' vehicle, who was later identified as Richard Thompson, was lying on his back on the passenger side of the vehicle, severely injured. In the approximately minute and a half that it had taken for Dembek to travel to the end of Sutton Road and back to the scene of the accident, Gittings, unbeknown to Dembek, had left the wreckage of the damaged vehicle. Dembek called on his police radio for an ambulance, and when it arrived, Richard was transported to the hospital. At the hospital, Dembek had a blood-alcohol test performed on Richard, the results of which indicated that he had a blood-alcohol level of .207, which "would be expected to have impaired [his] mental and physical functions."

Gittings testified as follows: He arrived at the boat show at about 1 p.m. and had one beer. At about 4:30 p.m., he and Richard went to the Assembly and had some beers, then went to the hospital for approximately 30 minutes, and later returned to the Assembly at about 7:30 p.m. for one more beer. Although Gittings testified in his deposition that he had a total of eight beers at the Assembly, at trial he stated that he had a total of four beers while there, but had not eaten anything during the day. At about 8 p.m., he left the Assembly accompanied by Richard and attempted to drive him to his home in Lake in the Hills.

Gittings further testified that although Route 62 led directly to Richard's home in Lake in the Hills, he took Sutton Road because it was a "scenic drive." He had driven on Sutton Road only a few times before the accident, most recently two years earlier, and never at night. He was intoxicated while driving down Sutton Road at a speed

of 45 miles per hour, but felt able to drive and did not think his physical abilities had been "impaired that much." He neither heard nor saw a police car as he drove on Route 62. He saw a speed limit sign for the road but did not see any sign indicating any curves in the road. The next morning, he was arrested and later convicted of reckless homicide, Richard having died of his injuries 133 days after the accident.

Robert Lippman, a civil engineer, called by plaintiffs, testified as follows: The curve on northbound Sutton Road where Gittings turned off the road should have been marked with a sign indicating that the curve was a "sharp" one instead of one indicating that it was a "gentle" curve. One would not expect the curve at that point to be a sharp one because although there were two "gentle" curves before that one, all three were indicated as "gentle" ones. A driver would therefore expect the third curve to be gentle and might not have enough time to react on finding the unexpected. The "sharp" (or third) northbound curve was particularly difficult to see because it was not visible until a driver was within 10 to 15 feet of it, after the driver proceeded past the crest of a hill. In contrast, the southbound portion of the road at that point properly indicated the presence of a "sharp" curve. Centerlines and edgelines, such as those on Sutton Road, are sometimes not visible at night, especially to one who is driving over a hill, so "chevrons" should have been placed around the curve.

Lippman further testified that during the three years before Gittings drove off Sutton road, six accidents had occurred near the same curve involving northbound traffic and this should have provided the County with notice of a dangerous condition. It was Lippman's opinion that Richard Thompson used the road in an intended and permitted manner, and despite Gittings' and Thompson's intoxication, Thompson's use of the road was foreseeable. The fact that he had gotten to the point where he drove off the road showed that he was in "fairly good shape" until he was surprised by the curve.

On cross-examination, Lippman conceded that chevrons "were somewhat of an innovation when this accident occurred" and that he "could not fault the county if they had not installed chevrons at that time."

Robert Seyfried testified that he was a highway expert and traffic and highway engineer, and that based upon tests that he and the County conducted, the signs and pavement markings on Sutton Road provided adequate warning of the curve where Gittings turned off, to those who drove within the legal speed limit.

At the close of all the evidence, defendants moved for a directed verdict based upon, among other grounds, the absence of any duty owed to plaintiffs. The motion was denied, the trial judge stating, "It's a question of fact as to whether or not the County proximately caused this injury despite the testimony \*\*\*." The jury returned a verdict in the net amount of $2,361,740, after reducing the gross amount by 23% for Richard's negligence. Defendants' motions for judgment notwithstanding the verdict, or in the alternative, a new trial, were denied.

■ In light of Gittings' testimony that he did not see any signs but the posted speed limit on Sutton Road, it is difficult to imagine what all of the jousting over the content of the highway signs was all about; nor was there any dispute over the placement or the location of the signs. No matter, for the disposition we make of this case requires no tedious cerebration over this issue. Defendants, citing *Curtis v. County of Cook* (1983), 98 Ill. 2d 158, argue that under the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1981, ch. 85, par. 3—102(a)) (the Act), they did not owe any duty to Richard because he was not an intended and permitted user, in the exercise of ordinary care, of Sutton Road. The Act provides:

> "Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition *for the use in the exercise of ordinary care* of people whom the entity *intended and permitted* to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used \*\*\*." (Emphasis added.) Ill. Rev. Stat. 1981, ch. 85, par. 3—102(a).

In *Curtis*, plaintiff was a passenger in an automobile which was being used for speed-clocking, "a form of drag racing in which a motorist attempts to reach the greatest possible speed in the space of a quarter mile" (*Curtis*, 98 Ill. 2d at 161), and alleged that she was in the exercise of due care, but that the defendants were negligent in failing to take adequate steps to prevent such activity, thus causing her to suffer severe physical injuries. 98 Ill. 2d at 161.

Plaintiffs, however, maintain that in accordance with the holding of the court in *Palladini v. City of East Peoria* (1985), 134 Ill. App. 3d 345, the doctrine of comparative negligence governs in this case. In *Palladini*, plaintiffs brought suit after their son suffered fatal injuries caused when his motorcycle struck a large hole in the city's road, went out of control, and smashed into a tree. The trial court

granted the city's motion to dismiss, in which the city contended that no cause of action was stated in the four counts at issue in the case since the plaintiffs failed to allege that decedent was in the exercise of ordinary care, citing section 3—102(a) of the Tort Immunity Act. On appeal, the court, while conceding that "[a] literal reading of the Act would lead one to believe that the legislature intended that a municipality has no duty to one who is contributorily negligent," stated:

"The principal thrust of the Act was to hold a municipality to the same standards as a common law defendant. At the time this meant that contributory negligence was a complete affirmative defense. The advent of comparative negligence alters only the results, not the standards. A municipality has a duty to maintain its property in a reasonably safe condition. Persons using the property still must use ordinary care. When those duties are simultaneously breached, however, it is the effect which is different due to the changes dictated in *Alvis* [*v. Ribar* (1981), 85 Ill. 2d 1]. Thus, accepting the thesis that the Act seeks to apply common law standards to municipalities, the purposes of the statute are served by applying comparative negligence." (*Palladini*, 134 Ill. App. 3d at 348.)

However, plaintiffs and the *Palladini* court overlook that in upholding the grant of judgment on the pleadings to the defendants in *Curtis*, the court noted that the plaintiffs had pleaded the absence of any negligence on the part of the passenger, and, deciding the case strictly in accordance with the provisions of the Tort Immunity Act, ruled that the county and village defendants owed her no *duty* thereunder.

●■ ■ We must therefore determine whether the trial court erred in denying defendants' motion for a judgment notwithstanding the verdict, in which it contended that defendants did not owe Richard a *duty*, for "[a]lthough the questions of whether a duty has been breached and whether the breach proximately caused an injury are factual matters [citation], the *existence* of a *duty* must be determined as a matter of law. [Citation]." (Emphasis added.) (*Curtis*, 98 Ill. 2d at 163.) As *Curtis* further instructs us, "[t]he Local Governmental and Governmental Employees Tort Immunity Act, which was enacted at least in part as a result of this court's rejection of the principles underlying the sovereign immunity doctrine in *Molitor v. Kaneland Community Unit District No. 302* (1959), 18 Ill. 2d 11, is in derogation of the common law action against governmental entities and specifies certain *limitations* on the liability of such bodies." (Emphasis added.) (*Curtis*, 98 Ill. 2d at 164.) The court went on to hold that

"[o]ne of those *limitations* [(emphasis added)] appears in section 3—102(a)" of the Act, quoted above, and that

"[the] language [of the Act] evinces a legislative intent to extend a duty of care *only* to those persons by whom the local government intended the property to be used. As a passenger in a speed-clocking automobile, Deborah Curtis cannot be said to fall within the class of motorists by whom defendant's highways were intended to be used. [Citations]." (Emphasis added.) (*Curtis*, 98 Ill. 2d at 164-65.)

Moreover, section 4 of Article XIII of the Illinois Constitution abolishes sovereign immunity "[e]xcept as the General Assembly may provide by law." (Ill. Const. 1970, art. XIII, §4.)

"The primary rule in the interpretation and construction of statutes is that the intention of the legislature should be ascertained and given effect. [Citation.] The legislative intent should be sought primarily from the language used in the statute. Where the language of the act is certain and unambiguous the only legitimate function of the courts is to enforce the law as enacted by the legislature. [Citations.] It is never proper for a court to depart from plain language by reading into a statute exceptions, limitations or conditions which conflict with the clearly expressed legislative intent. [Citations.]" *Certain Taxpayers v. Sheahen* (1970), 45 Ill. 2d 75.

We therefore decline to follow *Palladini*, it being the sole prerogative of the General Assembly, under the constitutional provision cited above, to define the *nature and extent* of the tort liability of local public entities. In view thereof, it becomes unmistakably clear that local public bodies may be successfully sued in Illinois only upon those terms and conditions and within the "limitations on the liability of such bodies" as specified by the General Assembly (*Curtis*, 98 Ill. 2d at 164 (and the cases there cited))—all of which clearly explains the *Curtis* court's holding that Deborah Curtis' pleadings had to survive the defendants' challenge that she failed to demonstrate that her action came within the plain provisions of the Act: that she was an intended and permitted user, in the exercise of ordinary care, of a public roadway.

■ Plaintiffs contend, however, that *Curtis* is inapplicable because there the passenger was an active participant in an illegal activity. Yet the complaint in *Curtis*, as noted in the opinion, states that the plaintiff passenger, a minor, age 16, was in the exercise of the degree of care required of one of her "age, experience, intelligence and understanding," a necessary allegation since the incident complained

of occurred prior to our adoption of the doctrine of comparative negligence in *Alvis*. Nevertheless, our supreme court held, in granting judgment on the pleadings, that:

> "As a *passenger* in a speed-clocking automobile, Deborah Curtis cannot be said to fall within the class of *motorists* by whom defendant's highways were intended to be used. [Citations.]" (Emphasis added.) *Curtis*, 98 Ill. 2d at 165.

It is to be carefully noted that the *Curtis* court drew no distinction between the driver and the admittedly passive passenger in determining the liability of the defendants. (*Curtis*, 98 Ill. 2d at 165.) Accordingly, plaintiffs' argument that Gittings' culpability as *driver* cannot be imputed to Thompson as his *passenger* is irrelevant in light of the *Curtis* court's clear and unmistakable holding that a *passenger*, however passive, does not come "within the class of *motorists* by whom defendant's highways were intended to be used." (Emphasis added.) 98 Ill. 2d at 165.

But we need not enter into any extended disputation as to whether the foregoing discussion of *Curtis* furnishes an answer to plaintiffs' contention regarding Richard's alleged freedom of any negligence, for the finding of an absence of a duty is not in all cases determined by an examination of the pleadings, or even during the course of pretrial proceedings. Nor does it require any citation of authority that a timely raising of the issue and the making of a proper record thereon suffice to preserve it for review in the event of an adverse ruling, as happened here. Based on the evidence adduced in this case, the jury determined Richard to have been 23% negligent in causing his own demise, a verdict hardly consistent with the statutory requirement that he be in the exercise of ordinary care, and a verdict plaintiffs do not challenge. The record is also clear, as Gittings testified, that Richard did not object to his driving him home, and that Richard never asked Gittings "to pull over because he wanted to get out of the car." The argument, therefore, cannot be sustained that Richard falls "within the class of motorists by whom defendant's highways were intended to be used." *Curtis*, 98 Ill. 2d at 165.

For the foregoing reasons, the judgment of the circuit court is reversed.

Reversed.

HARTMAN and DiVITO, JJ., concur.