DEBRA D. SMITH, Plaintiff-Appellee, v. THE CITY OF EVANSTON, Defendant-Appellant.

First District (2nd Division)    No. 1—91—4057

Opinion filed March 22, 1994.—Rehearing denied April 13, 1994.

Russell W. Hartigan & Associates, of Chicago (Russell W. Hartigan, Patrick H. O'Connor, and Keith A. Mandelski, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon (Ruth E. VanDemark, James B. Vogts, and Lauren L. McFarlane, of counsel) and Swanson, Martin & Bell (Kevin T. Martin, of counsel), both of Chicago, for appellee.

JUSTICE McCORMICK delivered the opinion of the court:

Plaintiff, Debra D. Smith, sued the City of Evanston (Evanston) for causing a car crash by failing to post a proper warning sign. In an itemized verdict, the jury awarded plaintiff all of her post-accident medical expenses, but nothing for disability. The trial court granted plaintiff's post-trial motion for a new trial on damages only and this court granted Evanston's petition for leave to appeal.

We affirm because we find that the trial court did not abuse its discretion by granting plaintiff a new trial or by limiting the new trial to damages.

Around 2:30 p.m. on November 24, 1984, Catherine Olivieri, while driving west on Emerson in Evanston, decided to turn left at Ridge. The traffic signal at the intersection held a sign which said "obey your signal only." She stopped in the intersection and waited to make her turn. When her traffic signal turned red she made her turn, although she noticed another vehicle about 30 feet from the intersection approaching her from the west. The other car, which Steven Smith drove, continued into the intersection at 20 or 25 miles per hour. When Olivieri saw that Steven was not stopping at the intersection, she tried to accelerate to complete her turn. Steven slammed his brakes and turned to his left, but the front right fender of his car hit the middle of the right side of her car. Plaintiff, Steven's wife, went forward and back in the passenger seat of Steven's car. Steven's traffic signal was green when he entered the intersection, and it was still green when he looked at it after the crash.

Plaintiff was shaking and pale after the accident, but she was not

bleeding. Steven put her seat back so that she was almost lying down. He went to Olivieri's car and Olivieri yelled at him that he had run a red light. Steven called the police to report the accident.

Officer Dwayne Struchen arrived shortly thereafter and spoke to Olivieri and Steven. He timed the traffic signal to make sure it was functioning properly. He found that eastbound Emerson had a green light which continued for almost 20 seconds after the signal for westbound Emerson turned red, and he knew that the lagging green was intended at that intersection. He asked plaintiff whether she was hurt. Although he could see no visible signs of injury, she complained that her back was sore and she was having difficulty breathing.

Plaintiff and Steven sued Olivieri for driving negligently and Evanston for failing to warn drivers of the different timing of the traffic lights for eastbound and westbound traffic. Olivieri countersued Steven and Evanston, and Evanston countersued Steven and Olivieri. During trial plaintiff reached a settlement with Olivieri. The trial court found that the parties settled the case in good faith, so it dismissed Evanston's countersuit for contribution from Olivieri along with plaintiff's suit against Olivieri. Olivieri and Evanston voluntarily dismissed their suits against Steven. Steven voluntarily dismissed his claims against Olivieri and Evanston. Trial proceeded only on plaintiff's claim against Evanston.

David Jennings, city traffic engineer for the City of Evanston, testified that the sign "obey your signal only" implies that the traffic signal facing a driver may be on a different timing sequence from the signal for traffic in the opposite direction. He admitted that the sign was possibly intended to instruct drivers that they must ignore the nearby signal at Emerson and Green Bay while proceeding through the intersection at Emerson and Ridge. He agreed that "it would be good traffic engineering judgment to have placed an ['Joncoming traffic has a longer green light[' sign] at the intersection of Emerson and Ridge."

Thomas Trigg, assistant traffic engineer for the City of Evanston, testified that the "obey your signal only" sign did not inform westbound drivers on Emerson that eastbound drivers had a longer green light. He agreed that if the goal is to inform a driver that oncoming traffic may still have a green after the driver's light has turned red, "the clearest and simplest message to put on a sign [is] o[n]coming traffic has a longer green." He believed that the "obey your signal only" sign was sufficient to comply with the Manual on Uniform Traffic Control Devices, which gave no specific guidelines for posting either that sign or the sign "oncoming traffic has a longer green light." In his opinion, there was no need to warn westbound

drivers at Emerson and Ridge of the difference in timing of the stoplights.

Paul Box, a traffic engineering consultant, testified as an expert witness on defendant's behalf. He admitted that the sign "obey your signal only" instructs a motorist to "look at [her] signal and not some other signal that may be 100 or 200 feet away that's also within [her] line of sight." He agreed that the primary purpose of the sign at Emerson and Ridge was "to tell westbound drivers not to look ahead to the Green Bay-Emerson intersection but to obey the signal that was located *** at Emerson and Ridge." He testified that, although the sign "oncoming traffic has a longer green light" had long been in use, its message was not clear: "It does not tell you which way is longer, at the beginning or end of the cycle. It takes longer to read and has to be comprehended unlike the [']obey your signal only['] sign." He said that the "obey your signal only" sign could, but might not, give a westbound motorist on Emerson "notice of the existence of a different timing sequence" for eastbound Emerson.

The trial court asked Box how the sign could tell the driver anything about the signal facing traffic going the opposite direction. Box answered: "[T]he basic driver knows that you are supposed to obey your signal. Now when you face this and you've got the added sign at the location and you are facing a red, to me it gives you an added degree of caution that you should follow." The trial court clarified that the sign is "not addressing itself to the other side of the signal that's facing you." Box agreed.

Olivieri testified that she did not interpret the sign to mean she should take special care with eastbound traffic. She interpreted the sign to mean she should heed only the signal she saw for Emerson and Ridge.

The bulk of the testimony at trial concerned the injuries plaintiff suffered as a result of the accident. Since the car remained operable following the accident, plaintiff and Steven proceeded to their destination. Within two days of the accident, plaintiff started experiencing a throbbing backache, so she made an appointment to see her chiropractor, Dr. Harold Krueger, on December 3, 1984, nine days after the accident.

Dr. Krueger testified that he first treated plaintiff in 1979, five years before the accident, when she injured her back in horseplay with her husband on a beach. He had a series of appointments with her in 1979, all related to that injury. He treated her in both 1980 and 1981 for "chronic cervical and lumbar symptoms." She fell in 1983 and went back to Dr. Krueger for treatment of "acute lumbosacral sprain." She responded well to the manipulations and other

treatments he gave her. He treated her several times in February 1984 following a skiing trip during which plaintiff began experiencing back muscle spasms.

Dr. Krueger's manipulations in February 1984 provided plaintiff only temporary relief, so she went to see Dr. David Spencer, an orthopedic spine surgeon. Dr. Spencer testified that he administered a straight leg raise test and took X rays to determine whether she had a herniated disk. Since she was able to raise her leg 90 degrees, her leg raise test did not indicate herniation. The X rays also showed no herniation. He diagnosed her condition as "back sprain or back pain without sciatica." Plaintiff saw Dr. Spencer three times in one month in 1984, but he provided no treatment beyond the treatment Dr. Krueger provided because "there isn't anything reliable that you can do about this type of back pain."

Plaintiff missed almost a month from her work as a receptionist in February and March 1984. She reduced her hours to part-time from March until May 1984, losing almost 130 hours from her full-time work schedule. She felt much better by the summer and she was able to resume her considerable athletic activities. For most of her life prior to the accident, Debra was very active physically. Biking, camping, hiking and playing tennis were an important part of her life. During summer and fall 1984 she engaged in all of her regular physical activities without difficulty.

When Dr. Krueger saw plaintiff on December 3, 1984, he noticed her condition was much worse than it had been on her prior visits. Her husband carried her into the doctor's office. She explained that she had been in a car accident and she could barely walk. When she stood a severe muscle spasm caused her to bend forward. She complained of both numbness and pain. He administered a straight leg raise test. She was only able to raise her leg 50 degrees, and Dr. Krueger interpreted this as an indication of possible disk herniation. He could not provide much relief.

Steven needed to take a business trip to Florida in mid-December 1984 and he had arranged to take plaintiff with him. She went on the vacation despite her pain because she thought "the warmth would make [her] feel better and the relaxation would make [her] feel better." Her condition did not improve. She took several more days of vacation from work at the end of December, just lying around the house in pain. She took the time as vacation rather than sick time because she would lose her vacation pay if she did not use it. She took no sick days in November or December 1984.

Dr. Krueger continued to treat her for back pain, seeing her 12 times between December 3, 1984, and February 11, 1985. He

suggested that she should see Dr. Irwin Carson, an orthopedic surgeon.

Dr. Carson testified that plaintiff came to him for treatment for the pain and discomfort she experienced in pursuing her daily activities. For example, she would "try to cook for a period of time, [and] have pain in her leg or pain down her back." Dr. Carson looked at CT scans of plaintiff's back taken a year earlier and agreed with Dr. Spencer that her spine was then normal. He agreed with Dr. Krueger that her recent straight leg raise test indicated nerve root irritation, possibly due to disk herniation. He ordered new radiologic tests, including CT scans and an MRI. The tests showed a disk bulging so far that it might be herniated. However, her symptoms of nerve root irritation were not deteriorating, and there could have been causes other than herniation for the irritation and bulging.

Plaintiff reported marginal improvement in her condition on visits to Dr. Carson after February 1985, but her range of activity remained severely restricted. Dr. Carson ordered medication and physical therapy to improve her ability to engage in her normal activities.

In July 1985 plaintiff's condition deteriorated substantially, and Dr. Carson's tests indicated sharply increased pressure on her nerve roots. Dr. Carson concluded that at least one disk was herniated, and from his further tests he concluded that a second disk was also herniated. He performed a procedure called chemonucleolysis, in which the medicine chymopapin is injected directly into herniated disks. Although plaintiff did not know the cause of her back pain, Dr. Carson concluded that the car accident contributed to the need for chemonucleolysis.

Chemonucleolysis is for most patients a relatively quick procedure, but some patients, after a chymopapin injection, experience severe muscle spasm. Plaintiff was one such patient. She stayed in the hospital for a week following the chemonucleolysis because of the spasms. She continued to experience such spasms episodically for several months. Her condition improved markedly, partially due to the exercise program Dr. Carson prescribed for her, which helped increase her capacity for normal activity. However, she has continued to experience occasional back muscle spasms, and in Dr. Carson's opinion, plaintiff is likely to experience similar spasms in the future, all as a result of the chemonucleolysis procedure. She also has persistent minor pain which Dr. Carson considered a permanent effect of the chemonucleolysis he performed. In an examination of plaintiff in 1989, Dr. Carson found no evidence of neurological impairment, and in 1990, he indicated that her spine motion was normal. He agreed

that prior to the accident plaintiff "may have had some mild degenerative disk disease."

Dr. Marshall Matz, a neurosurgeon, testified that he reviewed plaintiff's medical records to prepare to testify on defendant's behalf. He saw no evidence of disk herniation in the tests performed in 1985. He found no relationship between the car accident and the chemonucleolysis, which he believed to be inappropriate treatment for plaintiff.

Plaintiff and Steven testified that since the accident plaintiff has severely curtailed her physical activities. She and Steven tried to play tennis two or three times, but she was afraid to move. She and Steven joined a health club where she had a special trainer assist her with the physical therapy Dr. Carson prescribed. She and Steven also tried to go camping twice, but they decided to stop because it aggravated her pain. She gave up most of her other activities. After the accident but before the chemonucleolysis, there were three occasions on which she was in so much pain when she came home from work that she crawled up three flights of stairs to get to her apartment. Her medical bills following the accident totalled $13,261.10, including $768.80 for her physical therapy. She lost wages of $7,936.44 during the time she took off from work in 1985 to obtain treatment for her back.

The trial court instructed the jury that defendant had a

> "duty to provide traffic warning signals, signs, markings, or other devices, where such signals, signs, markings or devices are necessary to warn of a condition which endangers the safe movement of traffic, and which would not be reasonably apparent to or anticipated by a person in the exercise of due care."

(See Ill. Rev. Stat. 1983, ch. 85, par. 3—104(b).) The trial court instructed the jurors to find defendant liable to plaintiff only if they found that defendant negligently failed to warn drivers westbound on Emerson that drivers eastbound had a longer green light at the intersection of Emerson and Ridge, and this failure to warn rendered the intersection not reasonably safe, and the negligent failure proximately caused the accident, and the accident caused plaintiff's injuries. If they found in her favor on liability, they should award her, by itemized verdict, an amount necessary to compensate her for the damages she suffered due to the car accident, broken down into categories the court specified.

The jury returned a total verdict in plaintiff's favor for $41,587.10, itemized as:

| | |
|---|---|
| Medical care | $13,261.10 |
| Earnings lost | 1,326.00 |
| Past pain and suffering | 10,000.00 |
| Future pain and suffering | 0 |
| Disability | 0 |
| Disfigurement | 0 |
| Aggravation of preexisting condition | 17,000.00. |

Plaintiff moved for a new trial on damages or on all issues. The trial court, at the hearing on the motion, said:

"[S]ome jurors have the impression [that] in order to give anything for disability it would have to be permanent. And some people further think that it has something to do with not being able to work, which is certainly one facet of it, but that's not *** what's totally involved with disability. It's the inability to do things that you formerly could do primarily.

*** I do think this is a case where the liability aspect can be severable from the damage aspect.
***

*** [F]or the first time in my judicial career I'm going to grant a new trial on damages only."

Defendant petitioned under Supreme Court Rule 306(a)(i) (134 Ill. 2d R. 306(a)(i)) for leave to appeal from the order granting a new trial on damages only. We initially dismissed this case due to defendant's failure to supply a table of contents for the record on appeal, as required by Supreme Court Rule 342(a). (134 Ill. 2d R. 342(a); see *Zadrozny v. City Colleges* (1991), 220 Ill. App. 3d 290, 292-93, 581 N.E.2d 44.) Because defendant has subsequently filed an adequate table of contents we have granted the motion to reconsider, and we now address the appeal on its merits.

Defendant argues that the trial court abused its discretion when it granted plaintiff a new trial. A trial court's decision to order a new trial will not be reversed unless the court obviously abused its discretion or clearly misunderstood the law. (*Williamson v. Swank* (1971), 2 Ill. App. 3d 600, 603, 276 N.E.2d 737.)

"The purpose of vesting the trial judge with power to grant a new trial is to permit him, before losing jurisdiction of the case, to correct errors that he or the jury might have made during the course of the trial. Courts of review have repeatedly stated that they will not disturb the decision of a trial court on a motion for new trial unless a clear abuse of discretion is affirmatively shown. The reason for this rule is that the trial court has had the opportunity to consider the conduct of the trial as a whole, and therefore is in a superior position to consider the effects of errors which occurred, the fairness of the trial to all parties, and whether

substantial justice was accomplished. [Citation.] Greater latitude is allowed a trial court in granting a new trial than in denying a new trial." (*Magnani v. Trogi* (1966), 70 Ill. App. 2d 216, 220, 218 N.E.2d 21.)

The trial court may properly grant a new trial to correct misleading instructions, even if neither party objected to those instructions. *Coukoulis v. Schwartz* (1938), 297 Ill. App. 377, 382-83, 17 N.E.2d 601; *McElligott v. Illinois Central R.R. Co.* (1966), 74 Ill. App. 2d 121, 131-32, 219 N.E.2d 785, *rev'd on other grounds* (1967), 37 Ill. 2d 459, 227 N.E.2d 764.

Here, the court concluded that the jury misunderstood the legal meaning of "disability," and it granted a new trial in part to correct that misunderstanding. Since that misunderstanding provides proper grounds for a new trial, the trial court's decision to grant a new trial here should not be disturbed unless the record affirmatively shows that the trial court's conclusion was clearly erroneous. See *McElligott v. Illinois Central R.R. Co.* (1967), 37 Ill. 2d 459, 469-70, 227 N.E.2d 764.

To determine the legal meanings of the categories the trial court used here, we review the development of the jury instructions on those categories. In 1976 the Illinois legislature amended the Civil Practice Act to require itemization of verdicts in all cases in which a jury assesses personal injury damages. (See Ill. Rev. Stat. 1991, ch. 110, par. 2—1109.) While the statute requires only that the itemized verdict reflect distribution among economic and noneconomic loss, our supreme court approved use of verdict forms which specifically itemize damages beyond economic and noneconomic categories. (*Powers v. Illinois Central Gulf R.R. Co.* (1982), 91 Ill. 2d 375, 387, 438 N.E.2d 152.) Trial courts have used the pattern jury instructions to determine which separate categories of damages to include on the itemized verdict form. See, *e.g., Lay v. Knapp* (1981), 93 Ill. App. 3d 855, 856, 417 N.E.2d 1099; *Doering v. Janssen* (1979), 76 Ill. App. 3d 62, 67, 394 N.E.2d 721.

Most of the pattern instructions on damages are based on case law that predates the use of itemized verdicts. In particular, Illinois Pattern Jury Instructions, Civil, No. 30.03 (3d ed. 1989) (hereinafter IPI Civil 3d No. 30.03), allowing recovery for aggravation of a preexisting condition, is based on a case from 1952 (*Behles v. Chicago Transit Authority* (1952), 346 Ill. App. 220, 231, 104 N.E.2d 635); IPI Civil 3d No. 30.04, allowing recovery for disability, is based on a 1917 case (*Krichbaum v. Chicago City Ry. Co.* (1917), 207 Ill. App. 44); and IPI Civil 3d No. 30.05, allowing recovery for pain and suffering, is based on cases from 1907, 1917 and 1939. (*Donk Brothers Coal &*

*Coke Co. v. Thil* (1907), 228 Ill. 233, 241, 81 N.E.857; *Krichbaum*, 207 Ill. App. 44; *McDaniels v. Terminal R.R. Association* (1939), 302 Ill. App. 332, 350, 23 N.E.2d 785.) These instructions, when approved, were designed only to inform jurors of considerations that should affect the determination of what single sum would fully and fairly compensate a plaintiff for losses. The instructions have not been revised to accommodate itemization.

In *Powers* our supreme court found that the separate headings of the pattern instructions do not always reflect elements of damages which are separate and distinct from other listed elements. The trial court there had presented to the jury a verdict form which required the jury to assess separate amounts for the "[n]ature, extent and duration of the injury ***[;] [d]isability resulting from the injury ***[; p]ain and suffering ***[; and t]he value of earnings lost." (*Powers*, 91 Ill. 2d at 378.) The jury awarded plaintiff $50,000 for each of the first three categories and $150,000 for earnings lost, and the trial court entered judgment against defendant for the total amount, $300,000. Defendant claimed that the $50,000 award for "[n]ature, extent and duration" duplicated the award for the other elements since that element cannot be distinguished from the others. Our supreme court held:

> "[A] jury cannot determine damages for the nature, extent and duration of a plaintiff's injury in isolation and apart from the remaining elements of damage. Any award for elements such as disability, pain and suffering, or disfigurement will of necessity involve and be based upon the jury's examination of and assessment of the nature, extent and duration of the injury. *** 'It is incomprehensible that the jury could place a monetary value on the nature, extent and duration of plaintiff's injury without relating such an award to the remaining items of compensable loss, disability and disfigurement, pain and suffering, and loss' of earnings (IPI Civil Nos. 30.04, 30.05, and 30.07).' ([*Powers v. Illinois Central Gulf R.R. Co.* (1981), 92 Ill. App. 3d 1033, 1044, 416 N.E.2d 1161,] (Kasserman, P.J., dissenting).) Obviously, that is the reason that in cases *** cited in the IPI comment, the jury was instructed to *consider* the nature, extent and duration of the plaintiff's injuries in reaching a verdict. But instructing a jury to consider the nature, extent and duration is not the same as instructing it to separately award for the nature, extent and duration of the injury. [Citation.]
> ***
> *** [The instruction] would permit a plaintiff to recover for the injury itself, in addition to recovering for all of the elements of damage which themselves are to compensate for the injury.

Because an award fully compensating the plaintiff for the injury itself would include compensation for those elements, it is clear that an instruction calls for a duplicative recovery if it tells the jury to award for the injury in addition to awarding for pain, suffering, disability, and other elements of damage." (Emphasis in original.) *Powers*, 91 Ill. 2d at 382-83.

The court held that the trial court committed error by giving the IPI instruction on nature of the injury as a separately compensable element. Accordingly, the IPI Civil 3d includes the instruction that the jury is to consider the nature, extent and duration of the injury when rendering its award on the separate elements of damages, but the nature of the injury is not to be regarded as itself an element of damages. IPI Civil 3d Nos. 30.01, 30.02.

In the discussion concerning instructions, the court in *Powers* relied on an article by Michael Graham entitled *Pattern Jury Instructions: The Prospect of Over or Undercompensation in Damage Awards for Personal Injuries*, 28 DePaul L. Rev. 33 (1978). Graham argued that the itemization of damages creates a risk of overcompensation, especially where the elements of damages overlap. (28 DePaul L. Rev. at 36.) He recommended treatment of the nature, extent and duration of an injury not as a separate element of damages, but as a consideration in assessing the compensation for the proper elements of damages. (28 DePaul L. Rev. at 58.) He also contended that the arguments regarding the nature of the injury applied with equal force to aggravation of preexisting conditions, and he recommended treating aggravation of conditions as a consideration in assessing the properly distinct elements of damages, not as a separate element of damages. 28 DePaul L. Rev. at 58.

We agree. Just as the court in *Powers* could find no measure for the nature of the injury as a separate element of damages, we find no measure for the value of aggravation of a preexisting condition that is separate from the other elements of damages. A jury appraising the monetary value of aggravation of the condition needs to look to the increase in medical costs, the earnings lost which would not have been lost by reason of the preexisting condition alone, the increase in pain and suffering, and the worsening of disabilities and disfigurement. As Graham stated, "Any change in the plaintiff's ailment or condition, being an injury in itself, is measured by its consequences to the plaintiff in the form of the appropriate elements of damage." (28 DePaul L. Rev. at 58.) An award for aggravation of a preexisting condition overlaps with awards for all of the other elements of damages, so inclusion of aggravation of conditions as a separate element leads to the same possibility of overcompensation

that led the court in *Powers* to rule against the use of nature of the injury as a separate element of damages, despite the approval of that as a separate category of damages in the IPI instructions then in effect. Insofar as *Parvin v. Sill* (1985), 138 Ill. App. 3d 325, 329-30, 486 N.E.2d 262, conflicts with our assessment of the meaning of *Powers*, we decline to follow *Parvin*. We hold that under the reasoning of *Powers*, aggravation of a preexisting condition is not a separate element of damages. It is, like the nature, extent and duration of the injury, a matter to take into account when assessing the proper, separable elements of damages.

Graham also argues that an instruction directing the jury to compensate a plaintiff for "disability" is unclear. "[T]he plaintiff's recovery for disability actually may overlap recovery for other elements of damage, such as pain, inconvenience, physical suffering, humiliation, and most importantly, mental suffering." (28 DePaul L. Rev. at 50.) In other contexts "disability" refers specifically to inability to work and diminished earning capacity, compensation for which would duplicate lost earnings. See *Petrie v. Industrial Comm'n* (1987), 160 Ill. App. 3d 165, 513 N.E.2d 104; Ill. Rev. Stat. 1991, ch. 48, par. 138.8(b)2.

To avoid this possible confusion, Graham recommends instructing the jury to compensate plaintiff for "loss of a normal life":

> "Recovery for diminished ability to lead a normal life compensates plaintiff for those non-pecuniary aspects of damage relating to plaintiff's inability to pursue or obtain the pleasurable aspects of life, such as recreation, hobbies, enjoyment of one's senses, marriage and children." 28 DePaul L. Rev. at 50.

Illinois courts have approved recovery of damages similar to those Graham describes as loss of a normal life. For example, in *Long v. Yellow Cab Co.* (1985), 137 Ill. App. 3d 324, 484 N.E.2d 830, the jury awarded the plaintiff a lump sum in a verdict which was not itemized and defendant appealed, contending that the award was excessive. The appellate court found the award not excessive because the jury could have included in the award sums to compensate the plaintiff for being "forced to curtail many of her avocations and other activities," including playing tennis and biking. (*Long*, 137 Ill. App. 3d at 327, 329; see also *Winters v. Greeley* (1989), 189 Ill. App. 3d 590, 598, 545 N.E.2d 422.) This decision is consistent with damage awards in Federal courts and in courts of most States. (See *Gumbs v. Pueblo International, Inc.* (3d Cir. 1987), 823 F.2d 768, 774-75 (and cases cited in Annot., 34 A.L.R.4th 293, 304-09 (1984)).) As the Nebraska Supreme Court stated:

> "A majority of courts, however, have approved inclusion of loss of

enjoyment of life as a consideration that may be instructed upon in a proper case and be considered by the jury in determining the amount of damages suffered by the plaintiff because of personal injury for which the defendant is liable." *Swiler v. Baker's Super Market, Inc.* (1979), 203 Neb. 183, 187, 277 N.W.2d 697, 700.

That court further clarified that loss of a normal life is often one aspect of damages sometimes classified as "disability."

"Loss of enjoyment of life may, in a particular case[,] flow from a disability and be simply a part thereof, and where the evidence supports it, may be argued to the jury. A separate instruction therein may be redundant. We do not recommend such an instruction be given, but find that under the facts of this particular case, where there is evidence from which the jury could find the injuries and resulting disability did cause loss of enjoyment of life, there was no error in giving the instruction, and we do not believe the jury was in any way misled." (*Swiler*, 203 Neb. at 187-88, 277 N.W.2d at 700.)

Illinois courts have also found that disability damages include damages for loss of a normal life. *Fetzer v. Wood* (1991), 211 Ill. App. 3d 70, 82, 569 N.E.2d 1237.

Here the court instructed the jury to award plaintiff an amount necessary to compensate her for the disability caused by the accident and an amount to compensate her for the aggravation of her preexisting condition. The jury awarded plaintiff $17,000 for aggravation of a preexisting condition, which is a category without legal meaning separable from the other categories of damages. The jury also awarded plaintiff all of her claimed medical expenses, including expenses for rehabilitation and physical therapy prescribed to alleviate the affects of her disability, but nothing for disability.

Defendant argues that we should construe the $17,000 the jury awarded plaintiff for aggravation of her preexisting condition as an award for disability because the aggravation "also encompasses future pain and suffering, disability and disfigurement." This court can amend a verdict only to make the verdict conform with the clear intention of the jury. (*Crowell v. Parrish* (1987), 159 Ill. App. 3d 604, 609, 512 N.E.2d 382.) In view of the itemized verdict specifically including $0 for disability, the record does not show that the jury clearly intended to award plaintiff any amount for disability, nor does the record show that the jury clearly found that the accident caused plaintiff's disability. The verdict here was sufficiently ambiguous so as to preclude any conclusion as to the jury's intent (see *Anderson v. Smith* (1980), 91 Ill. App. 3d 938, 941, 415 N.E.2d 643); the trial court did not abuse its discretion by failing to reform

the verdict to accord with defendant's speculation concerning the jury's intent.

■ We cannot say that the record affirmatively shows that the trial court erred in finding that the jury misunderstood the legal meanings of the categories of damages the court listed. We hold that the trial court did not clearly abuse its discretion by granting the motion for a new trial. We agree with the trial court's assessment that the misunderstanding probably resulted from the pattern instructions which fail to define the categories, and we also find that the pattern instruction directing the jury to give plaintiff a separate award for "aggravation of a preexisting condition" fostered further confusion. While the jury's misunderstanding of the categories is understandable, it is also grounds for granting a new trial. See *McElligott*, 37 Ill. 2d at 468-70.

To clarify the categories of damages at the new trial, we follow Graham and other commentators who recommend "loss of a normal life" as a category of damages instead of "disability," which has a common meaning that overlaps with other categories of damages, leading to an increased likelihood of overcompensation or undercompensation. (See 1 M. Minzer, Damages in Tort Actions, §§ 1.11, 8 (1992); Marth, *Loss of Enjoyment of Life—Should It Be a Compensable Element of Personal Injury Damages?*, 11 Wake Forest L. Rev. 459 (1975).) In *Fetzer* the parties effectively agreed that "loss of enjoyment of life" was not a separate element of damages, and the appellate court agreed. (*Fetzer*, 211 Ill. App. 3d at 82.) The parties also agreed that the trial court properly included disability as a separate element of damages. We, too, believe that disability and loss of a normal life cannot both be included as separate elements of damages. We are persuaded, however, by commentators, including Graham, who argue that "loss of a normal life" is less likely than the term "disability" to be misunderstood and to lead to duplication of damages awarded for other categories. Therefore, we hold that the trial court should instruct the jury to award the plaintiff, if she proves that the accident caused such loss, damages for "loss of a normal life," defined as plaintiff's "[d]iminished ability to enjoy life that the plaintiff has experienced" (28 DePaul L. Rev. at 60), which should include plaintiff's temporary or permanent inability to pursue the pleasurable aspects of life, such as recreation or hobbies. 28 DePaul L. Rev. at 50.

This category of damages, like all the categories of damages, must be subject to the general instruction that in assessing damages, the jurors must take into account the nature, extent and duration of the injuries resulting from the accident, and if the accident aggravated a preexisting condition, defendant is liable for damages, both temporary and permanent, caused by the aggravation of the

condition, and not for losses which would have resulted from the preexisting condition even if the accident had not occurred.

Defendant next argues that the trial court's conduct denied defendant a fair trial. If there is any validity to the argument, it further supports the conclusion that the trial court should have granted a new trial. Insofar as defendant objects to the trial court's ruling on the admissibility of evidence concerning plaintiff's doctors, the argument supports a new trial limited to damages.

■ Defendant contends that the new trial should extend to all issues because the court erred by questioning its traffic expert, Paul Box. Defendant waived this argument since it never objected to the questioning in the trial court, not even on the motion for new trial. Moreover, the court exercised its discretion to ask questions which clarified Box's testimony. (See *Oldenburg v. Hagemann* (1991), 207 Ill. App. 3d 315, 325, 565 N.E.2d 1021.) The trial court did not abuse its discretion in questioning Box.

Defendant contends that the trial court abused its discretion by limiting the new trial to the issue of damages. Decisions on motions for such limited new trials are within the sound discretion of the trial court. (*Deike v. Sears, Roebuck & Co.* (1983), 112 Ill. App. 3d 747, 749, 445 N.E.2d 1258.) The trial court appropriately grants a new trial limited to damages if the court finds:

> "(1) the jury's verdict on the question of liability is amply supported by the evidence; (2) the questions of damages and liability are so separate and distinct that a trial limited to the question of damages is not unfair to the defendant; and (3) the record suggests neither that the jury reached a compromise verdict, nor that, in some other identifiable manner, the error which resulted in the jury's award[ of] *** damages also affected its verdict on the question of liability." (*Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, 224, 380 N.E.2d 786.)

The evidence supporting the verdict on liability need not reach the level necessary to direct a verdict. (*Robbins*, 72 Ill. 2d at 224-25.) Our supreme court has explained that it "must be clear from the record both that there was sufficient evidence to find defendant liable, and that the jury did not confuse the issues of liability and damages." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.* (1987), 118 Ill. 2d 306, 320, 515 N.E.2d 61.

■ Plaintiff here needed to show that defendant owed her a duty which it violated, and the violation caused the accident. Plaintiff established that defendant owed her a statutory duty to provide signs which warn drivers of conditions which could endanger their safe movement. (Ill. Rev. Stat. 1983, ch. 85, par. 3—104(b).) Defendant cites *West v. Kirkham* (1992), 147 Ill. 2d 1, 588 N.E.2d 1104, in which

our supreme court held that under amendments to the statute at issue here, the municipality is immunized from liability for the kind of negligence alleged in this case. Defendant concedes that the preamendment version of the statute applies to this case, so *West* offers no help to its argument. Defendant also cites *Thompson v. County of Cook* (1991), 222 Ill. App. 3d 459, 584 N.E.2d 170, *aff'd* (1993), 154 Ill. 2d 374, 609 N.E.2d 290, in which this court held that local governments owed no special duty to keep its streets safe for use by drunk drivers or their equally inebriated passengers. Defendant does not contend that Steven was drunk or that he was in any other way not an intended user of Emerson, nor does defendant contend that it somehow owes a lesser duty to plaintiff, Steven's passenger, than it owed to Steven. Since plaintiff and Steven were intended users of Emerson, defendant owed them the statutory duty to keep the road reasonably safe.

The proof of causation was also sufficient: Olivieri testified that she did not guess that eastbound traffic on Emerson still had a green light; she turned, thinking that Steven would stop for the red light, and if she did not get out of the intersection, she would block traffic on Ridge, for which she thought the light was green. If defendant had posted a sign telling her that oncoming traffic had a longer green, she would have known that she could not safely turn.

Defendant's liability turned on the contested issue of whether defendant violated its duty to provide adequate warnings by failing to post the sign "oncoming traffic has a longer green light." All three traffic engineers testified that, in their opinions, the sign "obey your signal only" met defendant's duty to warn and that sign would give a reasonable driver notice that she must use special caution when proceeding through the intersection. Two of the engineers admitted that the "oncoming traffic" sign would better inform drivers of the peculiarity of the intersection. The jurors could consider their own experience as drivers and Olivieri's testimony regarding her understanding of the sign in determining whether defendant met its duty to provide warnings adequate for reasonable drivers. Thus, the evidence sufficiently supports the verdict on liability.

The liability issue is thoroughly separable from damages. The testimony of Olivieri and the traffic engineers relates solely to liability; the testimony of the doctors relates solely to damages. The questions of whether Evanston violated its duty to warn, and whether that violation caused the car accident, are entirely separate from the issues of the extent of plaintiff's damages and the degree to which the accident aggravated her prior condition.

The trial court should not limit a new trial to damages if the record indicates that the jury reached a verdict by compromise on the

issue of liability, or that the error in the damage award affected the verdict on liability. Where the record includes no positive indication of compromise, the court should not presume that the jury reached a compromise verdict. (*Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d·28, 46-47, 139 N.E.2d 275.) The court cannot rely on the inadequacy of damages or the inconsistency of the verdict to show that the verdict was compromised. (*Morse*, 10 Ill. 2d at 47; *Martin v. Cain* (1991), 219 Ill. App. 3d 110, 116, 578 N.E.2d 1161.) Defendant, as the appealing party, bears the burden on this appeal of showing from the record that the verdict is a result of compromise. *DeFreezer v. Johnson* (1967), 81 Ill. App. 2d 344, 348, 225 N.E.2d 46.

Defendant suggests that the jurors may have reached their verdict as a compromise on the issue of the extent of damages attributable to the car accident. The jurors clearly agreed that the accident aggravated plaintiff's preexisting condition, but they may have disagreed on the extent of the aggravation, and they may have compromised inadequate recovery for disability with recovery for aggravation. If defendant is right, and the jurors' compromise was only on the various items of damages, the new trial should be limited to the issue of damages. Defendant's conjecture would show that the jury did not "bargain[ ] inadequate damages for unjustified liability." *Morse*, 10 Ill. 2d at 47.

Defendant has pointed to no specific passage in the record which shows that the verdict resulted from a compromise on the question of liability. If defendant's conjecture is right, the trial on both damages and liability kept the jury from directing the attention needed to properly allocate the damages to the items in the verdict. Defendant has supplied a further reason supporting the trial court's decision to limit the new trial to damages. Defendant has not shown that the trial court abused its discretion by limiting the new trial to damages.

We agree with the trial court's finding that the jury misunderstood the legal meanings of the categories of damages, and therefore we affirm the decision to grant a new trial. Because the case meets the requirements of *Robbins*, we find that the trial court did not abuse its discretion in limiting the new trial to damages only. To clarify instructions on the categories of damages, we direct the court on remand to eliminate "disability" and "aggravation of preexisting condition" as separate categories of damages, and include instead "loss of a normal life," with other instructions consistent with this opinion.

Affirmed and remanded, with directions.

DiVITO, P.J., and HARTMAN, J., concur.