ROBERTA J. CANOPY, Plaintiff-Appellee, v. JASON L. HENTZ, Defendant-Appellant.

Third District   No. 3—02—0701

Opinion filed January 21, 2004.

Daniel P. Fossier, of Hughes, Hill & Tenney, L.L.C., of Decatur, for appellant.

John P. Nicoara, of Nicoara & Steagall, of Peoria, for appellee.

JUSTICE SCHMIDT delivered the opinion of the court:

A jury found for the defendant, Jason L. Hentz (Hentz), and against the plaintiff, Roberta J. Canopy (Canopy), in a personal injury action stemming from a two-vehicle motor vehicle accident. The trial court granted Canopy's motion for a new trial. Because no jury

demand was on file, a bench trial was held. The trial court found for Canopy and awarded damages in the amount of $50,000. Hentz now appeals the trial court's granting of the motion for a new trial. We reverse.

On August 28, 1998, Hentz's 1984 Ford LTD struck the rear of the 1984 Chevrolet Chevette in which Canopy was a passenger. The Chevette was stopped to make a left-hand turn, and the LTD was behind it, also preparing to turn left onto Route 29.

The driver of the Chevette, the plaintiff's ex-boyfriend, Joe Simmons (Simmons), stated that he saw the LTD stopped a few feet behind him prior to the accident. Before he was able to make his turn, the vehicles collided.

Testimony at trial made it clear that two significant issues were disputed between the parties. The first difference of opinion centered around the severity of the impact. The second dispute focused on what, if any, injuries the plaintiff suffered as a result of the accident.

## THE IMPACT

The plaintiff and Simmons characterized the impact as severe. Simmons claimed the impact caused his vehicle to "nose-dive" and noted it was a "pretty good jolt." He also testified that the impact caused damage to the driver's side rear taillight and bumper. The plaintiff, when discussing the impact, stated, "all of a sudden, just wham, and the car did—I was looking at the pavement instead of the car hood, and I thought we were flipping over into the road." She further stated that she "thought we were going upside down and being shoved out into" traffic. When asked if the impact did any damage to the car in which she was riding, the plaintiff stated, "I didn't give a shit about the car." Further questioning revealed that at some point she did inspect the car and that the car was never taken in for any repairs following the accident.

The defendant and passenger in the defendant's car characterized the impact as minimal. The defendant testified that he was stopped behind Canopy's vehicle at a stop sign. He thought the Chevette had begun to turn into the intersection. He took his foot off the brake, but he was not certain whether or not he began to press on the accelerator. He looked down, and when he looked up Canopy's vehicle was stopped. He applied his brake, but his car struck Canopy's.

The testimony of Hentz's passenger was consistent with Hentz's testimony. Hentz's father testified that he took pictures of the Ford that Hentz was driving shortly after the accident.

Photographs of both vehicles were entered into evidence. They showed no damage to the LTD and minor damage to the Chevette.

The rear bumper of the Chevette was bent slightly down and in on the driver's side; the photographs revealed no damage to the taillight or the rear of the vehicle.

## THE INJURIES

The plaintiff claimed significant injuries from this accident presenting medical bills totaling over $14,000.

Simmons testified that the plaintiff complained that her neck hurt immediately after the accident. After the accident, both cars proceeded to a nearby parking lot, and the police were called. Simmons did not remember if Canopy got out of the car while they were in the parking lot.

Plaintiff testified that she did not strike anything in the car upon impact. She had no visible physical manifestations of injury, such as bumps, cuts or bruises. However, she noticed her neck hurt immediately after the impact. She went on to state that as they waited for the police in the parking lot, her neck got stiffer and stiffer. On the drive home, she wanted her ex-boyfriend to "quit hitting the bumps" because "every bump hurt." While in the parking lot and on the drive home after the incident, the plaintiff's description of her condition was "the pain just kind of went up to the base of my head and then my head wouldn't turn. It was like rusted up on me almost."

This incident occurred on a Saturday. The immediately following Monday, the plaintiff went to work. While at work, she first indicated the pain became unbearable so it is then that she sought medical attention. She testified that she hadn't slept since the accident at the time she first sought medical attention.

At trial, the plaintiff discussed various activities, including horseback riding and playing with her son, in which she could no longer participate following the accident. She mentioned that "after the accident, walking across the yard could be a problem."

The plaintiff's family physician testified that when he first examined her after the incident, she had "no particular tenderness. Muscle strengths and tendon reflexes normal." Plaintiff's family physician also noted that the plaintiff experienced muscle spasms on this visit as well as all but one other following the accident. After prescribing physical therapy and treating her for two months for muscle spasms and headaches, he referred her to an orthopedic surgeon, Dr. Maxey. This referral was made October 30, 1998. The plaintiff preferred a different doctor, Dr. Judy Wright, and went to see Dr. Wright on December 2, 1998.

Dr. Wright treated the plaintiff until May of 1999. Dr. Wright testified that the plaintiff had complaints of neck pain, shoulders ach-

ing and occasional tingling in her feet and fingers. Dr. Wright ordered a series of diagnostic tests including an EMG, NCV and an MRI. She also prescribed a TENS unit, which provides electrical stimulation therapy, and ordered additional physical therapy. The results of the EMG and NCV showed "no cervical spine damage" and "no radiculopathy" but did show mild damage to the median nerve related to a preexisting injury. The results of the MRI noted "a slight reversal of the normal cervical curvature with no evidence of subluxation; and, two, there is no herniation or bulging of the discs in the cervical region."

Dr. Wright further noted that when she last treated the patient on May 7, 1999, the patient's condition was "back to her normal" and that she had "fully recovered from her cervicothoracic spine strain without permanent disability."

Both Dr. Wright and Dr. Morris opined that the plaintiff's injuries were causally related to the automobile accident. Both physicians testified that their causation analysis was based upon the subjective information supplied by the plaintiff. Dr. Wright testified that the nature of a person's injury in such matters depends on the amount of force, the position of the person and the body's response. Both physicians testified that they had no knowledge as to the amount of force created by the accident, the speed of the vehicles or the position of the plaintiff.

When testifying as to the basis for his opinion that this accident caused the plaintiff's injuries, the plaintiff's family physician testified as follows:

"Q. So really the basis for your causation opinion is that Miss Canopy told you, I was in an automobile accident, that is why I am here to see you?

A. That's correct. That is the reasonable conclusion that I would make on a patient that had not been seeing me for a neck problem and then comes and says, my neck hurts, and it is because I was in an automobile accident."

After the evidence concluded, the trial court directed a verdict on negligence in favor of the plaintiff, leaving open the issues of proximate cause and damages. The jury returned a verdict in favor of the defendant. The plaintiff filed a motion for a new trial, which the court granted. In the order granting a new trial, the court stated that the jury's verdict was against the manifest weight of the evidence. It was then they discovered that there was no jury demand on file and a bench trial was ordered. The parties stipulated that rather than repeating the evidence, the judge could make his decision based on the transcript of the jury trial. The judge entered a verdict for the plaintiff

and awarded over $50,000 in damages. Hentz now appeals the granting of the motion for a new trial.

## ANALYSIS

■ The trial court's decision to grant a new trial will not be reversed unless it is affirmatively shown that the court abused its discretion. *Maple v. Gustafson*, 151 Ill. 2d 445, 455, 603 N.E.2d 508, 513 (1992). Since the trial court has the opportunity to consider the trial as a whole, the court is awarded greater latitude in granting a new trial than in denying one. *Smith v. City of Evanston*, 260 Ill. App. 3d 925, 932-33, 631 N.E.2d 1269, 1275 (1994). When there is sufficient evidence to support the jury's verdict, it is an abuse of discretion for the trial court to grant a motion for a new trial. *Gaines v. Townsend*, 244 Ill. App. 3d 569, 576, 613 N.E.2d 796, 801 (1993).

Unquestionably, it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony. *Maple*, 151 Ill. 2d at 452, 603 N.E.2d at 511-12. On a motion for a new trial, a court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Maple*, 151 Ill. 2d at 452, 603 N.E.2d at 512. A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence. *Maple*, 151 Ill. 2d at 454, 603 N.E.2d at 512-13. A trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the court feels that other results are more reasonable. *Maple*, 151 Ill. 2d at 452, 603 N.E.2d at 512. A careful review of the record indicates this is exactly what the trial court did: attached different weight than did the jurors to certain evidence and drew different inferences therefrom.

■ The jury heard conflicting testimony on the severity of the impact. Clearly, the jury did not believe this accident injured the plaintiff. It also certainly concluded that the plaintiff was prone to exaggeration. There was ample evidence admitted at trial to support both these conclusions.

The plaintiff's orthopedic surgeon testified that the nature of one's injuries depends upon the force involved in the traumatic event and body positioning. Both of the plaintiff's medical experts stated they had no information relating to the amount of force involved in this accident or any information regarding the plaintiff's body position at the time of impact. Both doctors basically stated that their causation opinions were based upon the plaintiff telling them she was injured in

this accident. The jury was free to determine for itself whether it believed the plaintiff was a credible historian.

The pictures of the vehicles of this accident showed no damage to one vehicle and no appreciable damage to the plaintiff's vehicle. The plaintiff testified that the damage to her vehicle was so minor it had been driven for three years following the accident without repair. Nevertheless, the plaintiff stated the impact was of such force that she believed her vehicle would flip over upon impact. The jury was, based on the photos, free to disbelieve the plaintiff, which it obviously did.

Other statements made by the plaintiff could have certainly seemed unrealistic to the jury. Following the impact, the parties waited in a car dealership parking lot for the police to arrive. On cross-examination, the plaintiff testified as to the pain she experienced immediately after the accident, either at "the dealership talking to the police officer" or "driving back home that afternoon" by noting, "It just kept—the pain just kind of went up to the base of my head and then my head wouldn't turn. It was like rusted up on me almost."

The plaintiff claimed that on the ride home every bump her car traversed caused her pain. Specifically, she stated:

"Q. How did you feel when you got home?

A. Along the way I wanted him to quit hitting the bumps, I know that.

Q. Why was that?

A. Every bump hurt."

This was followed by a sleepless night but yet she sought no medical attention the next day. Another sleepless night followed but again, rather than seeking immediate medical attention, she went to work.

The jury certainly was free to assign weight to these claims by the plaintiff as well as her statement that this accident made walking across the yard a problem. It was also the province of the jury to weigh her physicians' testimony. While the plaintiff is correct in pointing out that it is uncontroverted that her family physician noted she suffered from muscle spasms, it is also uncontroverted that he stated he based his opinion that her injuries were caused by this accident on what "Miss Canopy told" him. There was no testimony that only trauma could cause muscle spasm. Even had there been such testimony, the jury would have been, based on its own experience, free to reject such testimony. Furthermore, the jury was called upon to weigh Dr. Wright's testimony regarding causation of the plaintiff's injuries in light of Dr. Wright's admission that she had no knowledge of two of the three factors (amount of force and positioning of the patient's body upon impact) that the doctor agreed were necessary to make such a determination.

There was ample evidence admitted at trial that could lead a jury to the conclusion that this plaintiff exaggerated the severity of the impact and the severity of her injuries, if any, that may have resulted from this accident.

A trial court possesses the discretion to vacate a jury verdict if it is against the manifest weight of the evidence. However, as stated above, a verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence. *Maple*, 151 Ill. 2d at 454, 603 N.E.2d at 512-13.

The jury here could have ruled in favor of or against the plaintiff. It unanimously chose the latter. Here, the opposite conclusion is not clearly evident. Moreover, the jury's findings were not unreasonable or arbitrary and were supported by the evidence. The bottom line is that the jury did not believe the plaintiff and the trial judge did. The medical testimony admittedly hinged on the credibility of the plaintiff. Therefore, we find it was an abuse of discretion to vacate the jury award and order a new trial.

For the foregoing reasons, the judgment of the circuit court of Tazewell County is reversed. This cause is remanded to the trial court to enter an order reinstating the jury verdict in favor of the defendant.

Reversed and remanded with instructions.

SLATER, J., concurs.

JUSTICE HOLDRIDGE, dissenting:

I respectfully dissent. The trial court's decision to grant a new trial will not be reversed unless it is affirmatively shown that the court abused its discretion. *Maple v. Gustafson*, 151 Ill. 2d 445, 603 N.E.2d 508 (1992). Since the trial court has the opportunity to consider the trial as a whole, the court is awarded greater latitude in granting a new trial than in denying one. *Smith v. City of Evanston*, 260 Ill. App. 3d 925, 631 N.E.2d 1269 (1994).

Here, the trial court directed a verdict on negligence. The remaining issues concerned causation and damages. The plaintiff presented extensive evidence concerning her injuries. Both of her treating physicians indicated that her injuries were consistent with her account of the accident. In the face of such evidence, we cannot say that the trial court's decision was an abuse of discretion. I would, therefore, affirm the trial court.