SHIRLEY VACALA, Plaintiff-Appellee, v. THE VILLAGE OF LA GRANGE PARK, Defendant-Appellant.

First District (5th Division)   No. 1—92—1553

Opinion filed March 31, 1994.

Russell W. Hartigan & Associates, of Chicago (Russell W. Hartigan, Keith A. Mandelski, and Patrick H. O'Connor, of counsel), for appellant.

Terrence K. Hegarty & Associates, Ltd., of Chicago (Terrence K. Hegarty, William J. Harte, and Joan M. Mannix, of counsel), for appellee.

JUSTICE COUSINS delivered the opinion of the court:

Defendant, the Village of La Grange Park (the Village), appeals from the circuit court order granting plaintiff, Shirley Vacala (Vacala), a new trial on the issue of damages only. Vacala was injured while riding in a car which collided with a set of railroad tracks located at the dead end of a street owned and maintained by the Village. She brought suit against the Village alleging that it was negligent in failing to provide any warning that the street came to a dead end. After the jury returned a verdict for Vacala in the amount of $1,000, although undisputed evidence showed that her medical expenses alone exceeded $15,000, Vacala moved for a new trial on the issue of damages only. The trial court granted the motion, and the Village appealed pursuant to Supreme Court Rule 306 (134 Ill. R. 306). On appeal, the Village argues that: (1) the trial court erred in denying its motion for judgment notwithstanding the verdict; and (2) the trial court erred in granting a new trial solely on the issue of damages.

We affirm.

BACKGROUND

## THE ACCIDENT

On November 4, 1984, shortly after midnight, an automobile crashed into the Indiana Harbor Belt Railroad tracks located at the end of Oak Street in La Grange Park, Illinois. Four people were in the vehicle at the time of the accident: Vacala, Caroline Tyrolt (Tyrolt), Edward Mills (Mills), and Dwyane Bulat (Bulat). Mills was driving and Vacala was sitting in the front passenger seat; Bulat was sitting behind Mills, and Tyrolt was sitting behind Vacala.

Vacala testified that prior to the accident, she and Tyrolt were at a social gathering at a friend's house in La Grange Park. Friends of Tyrolt's parents had given them a ride. Sometime after Vacala and Tyrolt arrived, two other people they knew, Mills and Bulat, arrived. Around midnight, Vacala and Tyrolt decided to go home and Mills offered to give them a ride.

Vacala testified that at the time of the accident she was not familiar with La Grange Park and she did not know that Oak Street came to a dead end after the intersection of Oak and Barnsdale. She gave general directions to Mills, telling him to go east. While they were driving, Vacala became aware of the fact that a police officer might be observing the car, and she heard Tyrolt tell Mills that she thought the policeman might be following them. Vacala testified that Mills did not drive any differently after this statement was made. As the car proceeded, it stopped at stop signs and its headlights were on. Vacala was trying to find a radio station, when she heard Tyrolt scream and she looked up. Vacala first became aware that the street came to a dead end when Tyrolt screamed. There were no signs on the street warning of the dead end or the railroad tracks. Also, there were no reflectors or barriers at the end of the road. Vacala testified that she was unable to see the railroad tracks before the car collided with them. She stated that the car was not moving at an excessive rate of speed at any time prior to the collision. Vacala could not recall whether Mills braked or slowed down prior to hitting the tracks.

After the collision, the next thing Vacala remembered was waking up and seeing people around her. She was trapped in the car, and she felt pain in her leg. Eventually, in order to get her out of the car, the back seat and the car door were removed from the car. She stated that the paramedics attempted to put her leg in traction, but it hurt so badly that she screamed. She was taken by ambulance to the Loyola Hospital emergency room.

Tyrolt testified that her parents' friends drove her and Vacala to a friend's house in La Grange Park. Sometime later, Bulat and Mills arrived. Around 11:30 or 11:45, Tyrolt and Vacala decided to leave, and Mills offered to drive them home. Mills' car, a 1980 Trans Am, was parked in a school parking lot nearby.

Tyrolt was unfamiliar with the area but she knew the general direction toward home. She and Vacala tried to give Mills directions, but they did not know the names of the streets or a specific route to take. They passed a couple of stop signs, at which the car stopped. As the car proceeded, Tyrolt talked with Bulat. A short time later, the car reached the intersection of Oak and Barnsdale.

Immediately before the collision, Tyrolt saw either grass or gravel before the end of the street and she yelled "dead end." She testified that the car could have been halfway between the concrete and gravel when she screamed. A couple seconds after she yelled, the car struck the railroad tracks. Tyrolt did not know the actual speed at which the car was travelling, but she testified that it seemed like they were proceeding at the speed limit. She did not feel Mills apply the brakes prior to the impact. Tyrolt did not see any dead end signs or reflectors before the car struck the railroad tracks.

After hitting the railroad tracks, Tyrolt passed out. She later woke up and got out of the car. Vacala was trapped in the car and she began to cry and complain about pain in her leg. Eventually, the paramedics helped Vacala get out of the car and took her to the hospital in an ambulance.

Mills testified that on the night of November 3, 1984, he and Bulat planned to meet Vacala and Tyrolt at a gathering in La Grange Park; Bulat had called Tyrolt and made the arrangements. That night Mills drove his 1980 Trans Am, which was not modified. He and Bulat arrived around 9 p.m., and Vacala and Tyrolt were already there. Around 11 p.m. he and Bulat left the gathering to drive Tyrolt and Vacala home.

Mills testified that he was unfamiliar with La Grange Park. He could not identify the streets or the route that he took when they left. He stated that the car stopped at two or three stop signs and Vacala and Tyrolt gave him directions. Mills stated that he was aware that there was a police car in the vicinity. He testified that he drove at the speed limit, with his headlights on. He stopped at the intersection of Oak and Barnsdale and then accelerated up to the speed limit. After stopping at the intersection, Mills did not slow down before hitting the railroad tracks and, although he tried to hit the brakes before the collision took place, he did not remember actually braking before hitting the tracks. A couple of seconds elapsed

between the time Mills tried to hit the brakes and the point of impact. He did not recall if someone yelled before the car hit the tracks. Mills testified that at the time he hit the railroad tracks, his speed was about 25 miles per hour.

Mills testified that he watched where he was going as he drove, but did not see the railroad tracks. Immediately before the car struck the railroad tracks, Mills was looking out the front window of the car. Prior to the accident, he did not see reflectors or any warning signs.

Bulat testified that sometime after 7 p.m., he and Mills arrived at a social gathering hosted by a friend of Vacala or Tyrolt. Tyrolt, possibly with help from Vacala, had given him directions to the gathering. After approximately an hour and a half, he and Mills left to drive Vacala and Tyrolt home. Bulat sat in the back seat and talked with Tyrolt. He stated that he did not pay much attention to how Mills was driving.

Vacala, who seemed like she knew where she was going, gave directions to Mills on how to take her home, but Vacala's directions "weren't the greatest directions." As they were driving, they saw a police car. Bulat stated that everybody in the car wanted to avoid the police car, but could not remember whether Mills said anything which made him think that Mills wanted to avoid the police car. Bulat stated that they turned off at the nearest street in order to avoid "eye contact between us." He testified that after seeing the police car, Mills changed his route and made five or six turns and did not make any stops. Initially, Bulat testified that before seeing the police car, the highest speed that Mill's car attained was 60 miles per hour, and after seeing the police car Mills drove about the speed limit. However, Bulat also stated that after they saw the police car, the speed of the car increased up to 60 miles per hour.

The accident occurred 5 to 10 minutes after they saw the police car. Bulat did not know in which direction they were travelling or what street they were on at the time of the accident. Just prior to the accident, either Vacala or Tyrolt screamed that there was a dead end. Bulat did not see any dead end signs and did not notice that the street ended until right before the accident.

Bulat did not have any opinion as to the speed of the car at the time he heard someone scream and he did not, at any time, look at the car's speedometer. He did state, however, that they were "cruising at a decent speed" and that they were going faster than the speed limit, which Bulat assumed to be 25 to 35 miles per hour.

Officer William Beaudway (Beaudway) testified that he was employed as a police officer by the Village. At about 11 p.m. on the

night of November 3, 1984, he began patrolling the streets, and around midnight, he noticed the black Trans Am car which he later learned was in an accident. Beaudway first saw the car in the parking lot of a junior high school, as passengers were getting into the car. Beaudway observed the car's lights come on and the car pull out of the parking lot onto the street, heading north. He followed the car to the next intersection, where the Trans Am stopped at a stop sign and then turned east; Beaudway continued north. Beaudway next saw the Trans Am three or four minutes later, as it was stopped at a stop sign at the intersection of Oak and La Grange Road. The Trans Am was facing eastbound on Oak and had travelled east and north of where Beaudway had first seen it. The headlights of the Trans Am were on. Beaudway did not observe the Trans Am exceed the speed limit or ignore traffic control devices at any time.

Sometime after midnight, Beaudway received notice of an accident at Oak and the Indiana Harbor Belt Railroad. He arrived at the scene in less than a minute, and upon arriving, he saw the Trans Am at the far east end of Oak Street, up on and over one of the railroad tracks. Beaudway observed three people standing near the rear of the vehicle, and as he approached the vehicle, he saw Vacala sitting in the front passenger seat. She told him that she was in pain and she appeared to be pinned in the car. A short time later, paramedics arrived at the scene and with the help of the fire department extrication crew, they were able to get her out of the car.

Mark Johnson (Johnson), who was employed by the Village as an emergency technician firefighter, testified that on the night of November 3, 1984, he was called to the scene of an accident near the intersection of Oak and Barnsdale. When Johnson arrived, he saw Vacala in the front passenger seat of the car; she had suffered an injury to her leg, and she was moaning and crying. Her leg appeared shortened and there was a deformity in her thigh, indicating a broken femur. After Vacala was removed from the car, emergency personnel tried to put a traction splint on her leg, but they were unable to do so because it caused her too much pain. Emergency personnel treated a cut on Vacala's chin and gave her oxygen through a mask. After approximately 40 minutes, Vacala was taken to Loyola Hospital in an ambulance.

Marylou Martin-McCabe (McCabe), a certified paramedic, testified that after she received a call about an accident at the intersection of Oak and the railroad tracks on November 3, 1984, she and a partner drove to the scene in an ambulance. When McCabe first observed Vacala, she was being taken from the car to the ambulance on a backboard. McCabe noticed that Vacala's leg was bent into an abnormal

position, with the foot toward the back of the hip. Vacala was moaning and crying, and she appeared to be in a great deal of pain. McCabe and other emergency personnel attempted to put a traction splint on Vacala's leg, but they were unable to do so because the muscle in Vacala's leg was under such stress that they could not straighten the leg.

John Giovannoni, who was employed by the Village as an emergency medical technician, testified that on the night of November 3, 1984, he was called to the scene of an accident at Oak and Barnsdale. Upon arriving, he observed that a car was on the tracks and Vacala was in the front passenger seat of the car. Giovannoni could see that her leg was broken because of the deformity in her thigh; her left thigh was shorter than her right thigh. In addition, Vacala's head was bleeding. In order to remove Vacala, the car door had to be cut off. Emergency personnel attempted to place a traction splint on Vacala's leg, but it caused more pain so it was not used on Vacala. Vacala remained conscious throughout the entire time Giovannoni observed her.

## INVESTIGATION OF THE ACCIDENT

Officer Beaudway testified that after the car was removed from the railroad tracks, he observed that at the point of impact, there was a three-inch space between the bottom of the rail and the railroad tie. He further observed that approximately 162 feet of track had been moved by the impact.

John McCadlow (McCadlow) testified that he was employed as a police officer with the Indiana Harbor Belt Railroad and his duties included patrolling railroad property and investigating complaints. On November 4, 1984, McCadlow was called to the scene of an accident at the end of Oak Street. He testified that when the car struck the outer rail, it pushed the rail away from where it had been originally located. The impact damaged 156 feet of track. The report prepared by McCadlow indicated that the vehicle was wrecked as a result of the accident and was towed from the scene.

John E. Dziak (Dziak) testified that he was employed as a project engineer by the Indiana Harbor Belt Railroad. His job duties included investigation of accidents at the railroad, and he went to the scene of the accident about a week after it occurred. He testified that a substantial amount of force would be required to move 165 feet of rail. Each three-foot section of rail weighed 115 pounds and there were ties every two feet. Each rail was held down by at least two spikes.

## ROADWAY CONDITIONS AT THE SCENE OF THE ACCIDENT

The parties stipulated that the Village is a municipal corporation which owned, controlled and maintained Oak Street, including the portion of Oak approximately 210 feet east of Barnsdale. The parties further stipulated that employees of the Village regularly repaired and maintained Oak for traffic.Officer Beaudway testified that there was no stop sign at the intersection of Oak and Barnsdale, but there was one street-light. After that streetlight, there were no other streetlights east on Oak before the railroad tracks. Beaudway stated that approximately 10 feet east of the intersection of Oak and Barnsdale, Oak Street changed from blacktop to gravel. Oak street continued toward the railroad tracks as a gravel road for approximately 60 feet and then turned into a grassy area which sloped upward to a three-foot rise from street level over a distance of approximately 40 to 42 feet. At the end of Oak Street there were three sets of rails, and on the far side of the tracks there was a chain link fence. On the east side of the tracks, Oak Street began again and the streetlights continued on the east side as well. Officer Beaudway testified that on the night of the accident, there were no warning signs at the intersection of Oak and Barnsdale. He also stated that there were no warning signs or reflectors east on Oak between the end of Oak and the tracks.

The Indiana Harbor Belt Railroad tracks divided La Grange Park in half and several streets, like Oak, stopped at the railroad tracks. Beaudway had no knowledge of any other accidents occurring at the intersection of Oak Street and the railroad tracks, or at any of the two or three similar intersections. Beaudway testified that like the intersection of Oak Street and the railroad tracks, there were no signs or reflectors present at the similar intersections.

In November 1984, Beaudway's duties encompassed routine patrol of the streets of La Grange Park. Among other things, he was supposed to be alert for and report any obvious roadway hazards, including the need for signs. If Beaudway observed that a sign was warranted or missing, he was to fill out a work order which would initiate the procedure to rectify the situation. Beaudway had driven past the area at the end of Oak Street on numerous prior occasions. Prior to the accident involving Vacala, Beaudway did not consider the absence of a warning sign or reflectors at the end of Oak Street to constitute a potentially dangerous condition because he had no personal knowledge of any accidents there or any complaints by residents of the area. Also, he did not believe that the responsibility for determining which signs were needed "exactly fell within a police officer's position"; he believed that other village agencies, such as the

traffic safety and public works department, maintained sign placement.

Timothy Schuenke (Schuenke), the village manager, testified on behalf of the Village. He conceded that the Village did not inspect roads and roadways within its boundaries on a regularly scheduled basis; nor did it have a policy for examining specific areas or roadways within its boundaries to determine if warning signs were needed. All employees of the Village were directed to keep alert for potentially dangerous conditions on the roadways and to report any problems, including the absence of a warning sign, to their supervisor or the appropriate authority. In addition, the Village employed 11 full-time people in its public works department who were charged with the maintenance of the streets. Once an employee perceived the need for a sign where there was previously no sign, the employee was to report the problem, by means of a work order or memorandum, to his supervisor, who would address the subject with Schuenke. Employees of the Village were not given written directions regarding what to do if they noted the need for warning signs on the roadways, but Schuenke verbally directed the heads of the Village departments to instruct their employees about the proper procedure.

Schuenke testified that in November 1984, there were several intersections in the Village where the road stopped at the railroad tracks. None of those intersections had dead end signs. Schuenke was not aware of any accidents at any of those intersections prior to November 1984. Although prior to the accident there were locations in the Village where reflectors had been placed, to Schuenke's knowledge there were no reflectors or dead end signs at the intersection of Oak and Barnsdale.

Robert Seyfried, an expert in traffic engineering, testified for Vacala. He stated that he went to the site of the accident, made various measurements, took slide pictures, and observed visibility at the scene at night. He also reviewed the accident report and photographs of the scene taken shortly after the accident.

Seyfried testified that the absence of warning signs was inadequate because drivers were provided no warning of the end of the road. Moreover, it was very difficult to detect the end of the roadway at night. Seyfried testified that at a minimum, the street should have been marked with reflectors arranged on an 18-inch panel. Such a device would provide notice to drivers that there was a hazard ahead. Seyfried also testified that there should have been a warning sign at the intersection of Oak and Barnsdale, indicating the dead end ahead.

Based on his observations, Seyfried opined that a driver using

low beam headlights under normal nighttime driving conditions would be unable to detect the end of the roadway or the presence of the railroad tracks until the driver was about 100 feet away from the tracks. At 150 feet, Seyfried stated that the slope leading up to the railroad tracks could be discerned, but that it was a gentle slope and could be mistaken for an incline in the roadway itself, as opposed to the end of the roadway.

Seyfried testified that the continuous series of streetlights on Oak Street west of the railroad tracks created the strong potential for a deceptive illusion that Oak was continuous, rather than a dead end. Seyfried opined that from the point where the railroad tracks become distinguishable, assuming a normal range of reaction time and stopping distance, a driver proceeding at the posted speed limit of 25 miles per hour would probably be unable to stop before striking the tracks. On cross-examination, Seyfried conceded that if a passenger had screamed at the point where the blacktop changed to gravel, and if the driver had hit the brakes at that time, he would have been able to stop before hitting the tracks.

Seyfried testified that the lack of previous accidents in the area was something he considered, but it did not affect his opinion in this case; in his opinion, a hazardous condition existed regardless of whether accidents had previously occurred at that location. Seyfried also stated that he expected that the area would have very low volume traffic and that accidents were rare on low volume roads. Finally, Seyfried testified that he did not believe there was sufficient information available to estimate the speed of the car, but that the conduct of the driver would not affect his opinion that the roadway was hazardous.

## VACALA'S INJURIES

The parties stipulated that if called to testify, Dr. Lorenz would testify that at 1:21 a.m. on November 4, 1984, Vacala was admitted to the emergency room of Loyola Hospital with an obvious deformity of her left femur, as well as cuts to her chin and the back of her head. Dr. Lorenz determined that Vacala had a comminuted fracture of the left femur; her femur was completely broken through, and bone chips were present. At 4:30 a.m., the cuts on Vacala's chin and the back of her head were sutured. At 5:40 a.m., Vacala was taken to the operating room, where Dr. Lorenz performed an operation to place the two pieces of bone together. To keep the ends of the bones together, he placed two endorods within the femur. On November 10, 1984, Vacala was discharged without a cast; she was prescribed crutches and Tylenol III. Vacala used a walker for approximately a

week, a cane for 5 to 10 days and nothing thereafter. From the end of November 1984 through the first week of January 1985, Vacala received physical therapy at Loyola. For awhile after the accident, Vacala walked with a slight limp but by sometime in 1985, she could walk without a limp and without pain. A December 19, 1985, report from Vacala's radiologist indicated that the fracture had healed.

On December 18, 1985, Vacala underwent a second operation to remove the endorods from her femur; endorods are removed only when they cause the patient pain or other problems. Vacala was discharged from the hospital on December 20, 1985, and she was again prescribed Tylenol III. She used crutches for 10 days and then walked without any assistance.

Dr. Lorenz saw Vacala for the last time on January 7, 1986, when he discharged her from his care. She had regained close to full strength in her quadriceps and her range of motion was good. The total amount of her medical bills was $15,298.

Vacala testified that when she was initially released from the hospital, she was unable to put weight on her leg and walked with various aides, including crutches, then a walker and then a cane. Following her release from the hospital, the pain she experienced kept her from sleeping. Thus, she took both pain killers and sleeping pills.

Vacala testified that prior to the accident, she was a student at Northern Illinois University and lived in De Kalb. After the accident, her doctor would not allow her to return to school to complete the fall semester. She underwent two months of physical therapy at Loyola before returning to school.

In January 1985, Vacala started going to classes again and, although she was not using any aides to help her walk, she had a bad limp and had her friends carry her books. She stated that for a couple of months, approximately every other day, her leg would swell and become inflamed around the knee. She took pain killers and medication for the inflammation. In addition, sometimes her knee would "give out," bending in and collapsing. While at school, Vacala underwent physical therapy two to three times per week throughout the spring semester.

The following fall, Vacala continued to have problems with her leg, including weakness, pain and occasional swelling. During the fall of 1985, she saw Dr. Lorenz and he decided that, in order to reduce the swelling in Vacala's leg, the rods should be removed. Around Christmas, Vacala was readmitted to Loyola Hospital for three nights and underwent an operation to remove the rods. The operation left scars on both sides of Vacala's leg from the knee up two to three

inches. Since her discharge, Vacala stated she did not normally have problems with her leg but, from time to time, especially in cold, rainy weather, she had pain in her leg, especially around the knee. Vacala also has scars on her chin as a result of the accident.

OPINION

I

Initially, the Village contends that the trial court erred by failing to grant its motion for judgment *n.o.v.* A judgment *n.o.v.* is properly entered in those limited cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) To recover on her claim of negligence, Vacala was required to prove that the Village owed her a duty, the Village breached that duty, and the breach proximately caused her injuries. See *Thompson v. County of Cook* (1993), 154 Ill. 2d 374, 382.

The Village first argues that pursuant to the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1—101 *et seq.* (West 1992)) it did not owe Vacala a duty of care. At the time of the accident, section 3—102(a) of the Tort Immunity Act provided in relevant part:

"Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used ***." (Ill. Rev. Stat. 1983, ch. 85, par. 3—102(a) (now codified as amended at 745 ILCS 10/3—102(a) (West 1992)).)

Relying on the appellate court decision in *Thompson v. County of Cook* (1991), 222 Ill. App. 3d 459, and the supreme court decision in *Curtis v. County of Cook* (1983), 98 Ill. 2d 158, the Village argues that no duty existed because the driver of the vehicle in which Vacala was riding was not exercising ordinary care and was not an intended user of the roadway. The Village's reliance on these cases is misplaced; both cases are distinguishable.

In *Thompson*, an intoxicated driver who was exceeding the speed limit drove off a highway thereby causing the death of his intoxicated passenger. The passenger's widow brought suit against Cook County alleging that the highway lacked proper warning signs. At trial, a police officer testified that he observed the vehicle exceeding the speed

limit and he pursued the vehicle. The officer estimated that the vehicle was travelling at speeds in excess of 80 to 85 miles per hour, though the posted speed limit was 35 miles per hour. At trial, the driver of the vehicle admitted that he was intoxicated and speeding at the time of the accident. At the close of all the evidence, the defendants moved for a directed verdict based upon the absence of any duty owed to the passenger. The motion was denied and the jury returned a verdict for the plaintiff, but also found that the passenger was 23% negligent in causing his own death.

On appeal, the *Thompson* defendants argued that under the Tort Immunity Act, they did not owe any duty to the passenger because he was not an intended user, in the exercise of ordinary care, of the roadway. Relying heavily on our supreme court's decision in *Curtis*, the appellate court concluded that defendants did not owe the passenger a duty because he did not fall "within the class of motorists by whom defendant's highways were intended to be used." *Thompson*, 222 Ill. App. 3d at 465.

In *Curtis*, plaintiff was a passenger in an automobile which was engaged in drag racing. She alleged that she was in the exercise of due care, but the defendants were negligent in failing to take adequate steps to prevent such activity, thus causing her to suffer severe physical injuries. (*Curtis*, 98 Ill. 2d at 161.) The supreme court upheld the trial court's grant of judgment on the pleadings, concluding that pursuant to the Tort Immunity Act, the defendants owed plaintiff no duty. (*Curtis*, 98 Ill. 2d at 164.) The court observed that the Tort Immunity Act "is in derogation of the common law action against governmental entities and specifies certain limitations on the liability of such bodies." (*Curtis*, 98 Ill. 2d at 164.) One of those limitations appears in section 3—102(a), and the language of that section "evinces a legislative intent to extend a duty of care only to those persons by whom the local government intended the property to be used." (*Curtis*, 98 Ill. 2d at 164-65.) The court concluded that the passenger in *Curtis* could not be said to fall within the class of motorists by whom defendant's highways were intended to be used. *Curtis*, 98 Ill. 2d at 165.

In contrast to *Curtis* and *Thompson*, no evidence was presented in the instant case which would show that the driver was either drag racing or intoxicated. In addition, although the evidence concerning the issue of Mills' due care was disputed, there was evidence presented which indicated that Mills was driving the speed limit and obeying all traffic control devices at the time of the accident. Finally, there was no jury finding in this case that plaintiff Vacala negligently contributed to her own injuries. Thus, the evidence in the

instant case does not support the conclusion as a matter of law that Vacala was "outside the class of motorists by whom defendant's [roadways] were intended to be used." On this basis, *Thompson* and *Curtis* are distinguishable.

We also note that the supreme court declined to address whether the plaintiffs were owed a duty in *Thompson*. (*Thompson*, 154 Ill. 2d at 384.) Instead, the supreme court affirmed the decision on the basis that the evidence was insufficient to show that the defendants caused or contributed to the injury. (*Thompson*, 154 Ill. 2d at 382-83.) The supreme court concluded that the record overwhelmingly established that the sole cause of the injury was the driver's intoxication and disregard for the traffic laws, and therefore, a judgment *n.o.v.* should have been granted on that basis. *Thompson*, 154 Ill. 2d at 382-83.

The Village next argues that, under section 3—104(b), a municipality has no duty to *initially* provide warnings of any kind. At the time of the accident, section 3—104(b) provided:

"Neither a local public entity nor a public employee is liable under this Act for an injury caused by the failure to provide traffic warning signals, signs, markings or other devices *unless such a signal, sign, marking or device was necessary to warn of a condition which endangered the safe movement of traffic, and which would not be reasonably apparent to or anticipated by a person in the exercise of due care.*" (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 85, par. 3—104(b) (now codified as amended at 745 ILCS 10/3—104(b) (West 1992)).)

The Village relies on *Thompson v. Cook County Forest Preserve District* (1992), 231 Ill. App. 3d 88, to support its contention.

In *Thompson v. Cook County Forest Preserve*, plaintiff, a seven-year-old boy, was injured on forest preserve property while attempting to walk across an area which apparently served both as a parking lot and a roadway. Plaintiff argued that the forest preserve had a duty to provide crosswalks and/or pedestrian crossing signs. Plaintiff's expert, who was a consulting engineer and professor of engineering, testified that the design of parking lot/roadway presented hazards to pedestrians and vehicles. He stated that the facility needed a six-foot-wide pedestrian crossing, and pedestrian crossing signs. The forest preserve's expert, also a consulting engineer, testified that crosswalks were unnecessary because pedestrians came from nonspecific points; crosswalks are intended to funnel large groups of pedestrians from one clearly defined point to another. He believed that the signage was adequate and that crosswalks would not have prevented the accident.

On appeal, the reviewing court determined that a crosswalk was

properly characterized as public improvement and that local governments have no duty to undertake public improvements. (*Thompson v. Cook County Forest Preserve*, 231 Ill. App. 3d at 94-96.) The appellate court next concluded that because the forest preserve had no duty to provide plaintiff with a safe place to cross, it logically followed that no duty existed under section 3—104 to warn of this allegedly dangerous condition. (*Thompson v. Cook County Forest Preserve*, 231 Ill. App. 3d at 96.) Finally, the appellate court concluded as a matter of law that the lack of a crosswalk was "not unreasonably dangerous," but instead " 'reasonably apparent' to motorists in the exercise of due care." (*Thompson v. Cook County Forest Preserve*, 231 Ill. App. 3d at 97-98.) Thus, the court concluded that there could be no duty to warn of a condition which was not unreasonably dangerous. In distinguishing the case from our supreme court's decision in *Janssen v. City of Springfield* (1980), 79 Ill. 2d 435, the appellate court stated:

> "In *Janssen* \*\*\*, liability to warn was based upon physical obstructions which created hazardous conditions to the roadway itself, thereby endangering normal travel. In each case, the defendant acted to create the condition. Here, by contrast, no permanent physical obstruction or other condition of the road was unreasonably dangerous. The simultaneous presence of pedestrians and cars at the Forest Preserve's facility in itself was not unreasonably dangerous. The Forest Preserve could reasonably expect drivers to watch for crossing pedestrians, and pedestrians to check before entering. \*\*\* [N]o condition on the Forest Preserve's land posed a danger absent the negligent act of either plaintiff or the motorist \*\*\*." *Thompson v. Cook County Forest Preserve*, 231 Ill. App. 3d at 97-98.

In the instant case, unlike *Thompson v. Cook County Forest Preserve*, the condition involved was not the lack of a public improvement, but instead a roadway which ended without any warning. Moreover, here, unlike *Thompson v. Cook County Forest Preserve*, the record does not allow us to conclude as a matter of law that an unmarked dead end is "reasonably apparent" to nighttime drivers exercising due care. Vacala presented the expert opinion of a traffic engineer who stated that the lack of warning was hazardous, regardless of whether the driver was exercising due care; his opinion was unrebutted. On this basis, we find *Thompson v. Cook County Forest Preserve* distinguishable.

The Village next argues that it had no duty under section 3—102(a) of the Tort Immunity Act because it had no notice that the condition at the end of Oak Street was dangerous. At the time of the accident section 3—102(a) provided in pertinent part:

"[A] local public entity *** shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in sufficient time prior to an injury to have taken measures to remedy or protect against such condition." (Ill. Rev. Stat. 1983, ch. 85, par. 3—102(a) (now codified as amended at 745 ILCS 10/3—102(a) (West 1992)).)

The Village points out that both the village manager and Officer Beaudway testified that they had no knowledge of any prior accidents at the end of Oak Street or other similar streets which ended at the railroad tracks.

The Village's argument is misplaced. Vacala was required to prove that the Village had notice of the *condition, i.e.,* the absence of warning signs or reflectors on Oak Street, not that the Village had notice that the absence of warning signs was not reasonably safe. (See *Tracy v. Village of Lombard* (1983), 116 Ill. App. 3d 563.) In *Tracy*, the court gave the following rationale for the rule:

"The village would suggest a reading of this provision to the effect that it must have notice both of the condition and of the unsafe nature of that condition. However, we believe that the phrase 'that is not reasonably safe' modifies the word 'condition' and is not meant to list a second element the notice of which must be proved. Thus, our reading is that the village must have notice of a condition which, whether or not the village knows it, happens to be unsafe." (*Tracy*, 116 Ill. App. 3d at 572-73.)

In the instant case, the evidence indicated that although the Village may have been unaware that the absence of warnings at the end of Oak Street was dangerous, it was aware of the fact that no warnings were present. Accordingly, we find that *Tracy* is dispositive of the notice issue.

Next, the Village argues that the jury verdict cannot stand because the evidence clearly shows that the conduct of Mills was the sole cause of the accident. The Village asserts that just prior to the accident, Mills was coming from a "social gathering" of young people on a Saturday night, he was trying to evade police officers and he was speeding. We note that judgment *n.o.v.* is inappropriate where there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome. *Maple v. Gustafson* (1992), 151 Ill. 2d 445, 454.

At trial conflicting testimony was presented concerning the speed of Mills' vehicle and whether Mills was exercising due care. Bulat gave the following testimony which is in itself inconsistent:

"Q. Now what was the highest speed Edward Mills' car traveled from the time you left the party to the time you saw the police officer?

A. I'd say 60 miles per hour.

Q. After seeing the police car to the time of the accident, what was the highest speed the car obtained that was operated by Edward Mills?

A. I can't give an accurate speed as far as that. I know we were going about the speed limit to get away from the police officer.

Q. You said that before seeing the police officer, his car at some point went as high as 60 miles per hour?

A. I'd say after seeing the police officer, our speed did increase. *** I'd say that would be the time that the speed, you know, accumulated to 60 miles per hour. That's the point."

Bulat further testified that he did not have an opinion as to the speed of the vehicle just prior to impact, but he believed that the car was going faster than the speed limit, which he assumed was 25 to 35 miles per hour.

In contrast, Vacala, Tyrolt and Mills all testified that they believed that Mills was driving the speed limit just prior to the accident. Vacala also testified that Mills did not drive any differently after they noticed the police vehicle. Finally, Officer Beaudway testified that he observed the Trans Am on several occasions and it did not exceed the speed limit or ignore traffic control devices at any time.

Vacala also presented unrebutted evidence that the condition at the end of Oak Street was dangerous. Seyfried, an expert in traffic engineering, testified that in his opinion the lack of traffic control devices at the scene of the accident rendered the roadway hazardous. He testified that it is very difficult at nighttime to detect the end of a roadway, particularly at this location. He opined that the layout of Oak Street could create the deceptive illusion that the roadway was continuous rather than a dead end. Seyfried testified that at a minimum, the street should have been marked with reflectors arranged on an 18-inch panel. Seyfried explained that such a reflective device at the end of the road would provide notice to the driver that there is a hazard ahead.

In addition to the reflectors, Seyfried also opined that, "there should have been a warning sign at the intersection with Barnsdale indicating that there [was] a dead end ahead." He testified that a dead end warning sign was a "standard sign in the Manual on Uniform Traffic Control Devices, and that was recommended by the manual but not absolutely required for this location." He also stated that "good traffic engineering practice and common sense would

indicate the need for [such a sign]." Finally, Seyfried opined that at the point where the tracks became distinguishable, it was very unlikely that a driver who was travelling at 25 miles per hour would be able to stop before striking the tracks.

We cannot agree with the Village's contention that the evidence shows that Mills was the sole proximate cause of the accident. When the evidence is viewed in the light most favorable to Vacala, it indicates either that Mills was not negligent and the Village was the sole cause of the accident, or that Mills was negligent and both Mills and the Village concurrently caused the accident. On these facts, the trial court quite properly denied the Village's motion for judgment *n.o.v.*

## II

Finally, the Village argues that Vacala is not entitled to a new trial solely on the issue of damages because the verdict is a product of compromise between liability and damages.

The amount of damages is generally within the discretion of the jury. (*Hollis v. R. Latoria Construction, Inc.* (1985), 108 Ill. 2d 401, 407.) However, a court may order a new trial if damages are manifestly inadequate or if proven elements of damages have been ignored or if the amount awarded bears no reasonable relationship to the loss suffered by the plaintiff. (See *Hollis*, 108 Ill. 2d at 407.) The decision to grant a new trial solely on the issue of damages is within the trial court's discretion and will not be reversed absent an abuse of that discretion. (See *Greco v. Coleman* (1985), 138 Ill. App. 3d 317, 322; *Deike v. Sears, Roebuck & Co.* (1983), 112 Ill. App. 3d 747.) Nonetheless, a new trial on the issue of damages should not be ordered unless: (1) the jury's verdict on the question of liability is amply supported by the evidence; (2) the questions of damages and liability are sufficiently distinct such that a trial limited to the question of damages would not be unfair to the defendant; and (3) the record does not suggest that the jury reached a compromise verdict. *Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, 224; *Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, 46-47.

■ After careful review of the record, we conclude that the verdict on the question of liability was amply supported by the evidence. Three of the people in the vehicle at the time of the accident testified that Mills was driving the speed limit and obeying traffic laws prior to the accident. Officer Beaudway testified that he did not observe the vehicle exceed the speed limit or ignore traffic control devices at any time. The only contrary testimony came from Bulat and his testimony was inconsistent.

Moreover, Vacala presented unrebutted evidence which demonstrated that the condition at the end of Oak Street was dangerous. Vacala's expert testified that the absence of warning signs was hazardous and that it was difficult to detect the end of a roadway at night. In addition, he stated that Oak Street was designed in a manner which was likely to create the deceptive illusion that the street was continuous rather than a dead end. He opined that at the point where the tracks became distinguishable, it was very unlikely that a driver who was travelling at 25 miles per hour would be able to stop before striking the tracks. In Seyfried's opinion, the end of Oak Street should have had reflectors and the intersection before the end of the road should have had a warning sign. The undisputed evidence indicated that Oak Street contained no warnings of any kind.

Next, we find the issues of liability and damages to be separate and distinct. This is not a case where the questions of damages and liability are inextricably intertwined. (See, *e.g.*, *Glassman v. St. Joseph Hospital* (1994), 259 Ill. App. 3d 730, 769-70 (Court found that the precise acts for which the hospital was to be held liable were crucial to determining the extent of its liability: if the hospital was negligent at 2 p.m., it may have contributed to much greater damage than its acts at 10 p.m. could have caused).) Nor is this a case involving comparative negligence; Vacala was not alleged to have negligently contributed to her own injury. Lastly, though it is possible that Mills may have been concurrently liable for Vacala's injuries, concurrent liability of others would not excuse the Village from liability. See *Greco*, 138 Ill. App. 3d at 324.

With respect to the final condition, we find no evidence of a compromised verdict. The Village relies on *DeFreezer v. Johnson* (1967), 81 Ill. App. 2d 344, to support its contention that the verdict was the result of a compromise. In *DeFreezer*, the trial court denied the plaintiff's motion for a new trial on damages and for a new trial generally. On appeal, the reviewing court held that although plaintiff was entitled to a new trial generally, the trial court did not err in denying the motion for a new trial on damages only because the record indicated that the verdict was the result of a compromise of liability against damages. The court reasoned:

> "The issues of [d]efendants' negligence and [p]laintiff's due care are sharply contested issues. Both the evidence and the inferences to be drawn therefrom are conflicting and would have been sufficient to support a verdict for either party. Under such circumstances we conclude that the verdict might have been a compromise of liability against damages and accordingly [p]laintiff is entitled only to a new trial generally." *DeFreezer*, 81 Ill. App. 2d at 348.

We disagree with the *DeFreezer* court's conclusion that the existence of conflicting evidence indicates that the jury compromised the verdict. If that were the rule, there could never be a new trial on damages where liability was contested. The standard to test whether a verdict resulted from a compromise is whether the verdict on the issue of liability was amply supported by the evidence (*Wade v. Rich* (1993), 249 Ill. App. 3d 581, 590), and we have concluded that the finding of liability was amply supported by the evidence. In any event, *DeFreezer* is distinguishable, because in that case, unlike the one at bar, the plaintiff's negligence was at issue.

The amount of damages awarded in the instant case was against the manifest weight of the evidence, but it does not follow from that fact alone that the verdict was a compromise. (See *Paul Harris Furniture Co. v. Morse*, 10 Ill. 2d at 46-47.) Furthermore, we find that all of the conditions necessary to justify granting a new trial on the issue of damages were present and, therefore, the trial court did not abuse its discretion in granting a new trial on the issue of damages only.

For all of the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

GORDON and McNULTY, JJ., concur.